2022 IL App (1st) 210990-U

No. 1-21-0990

Order filed December 16, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 17805 |
| | ) | |
| RAMON TORRES, | ) | Honorable, |
| | ) | William B. Raines |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for predatory criminal sexual assault of his four-year-old daughter is affirmed where trial counsel was not ineffective for failing to challenge the admission of defendant's positive test results for a sexually transmitted disease.

¶ 2    Following a jury trial, defendant Ramon Torres was convicted, *in absentia*, of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and sentenced to 55 years' imprisonment. On appeal, defendant contends his trial counsel rendered ineffective assistance because counsel failed to challenge the admission of defendant's positive test results for

chlamydia. Defendant argues the State was not entitled to admit such evidence because it did not fall under any of the exceptions to the physician-patient privilege enumerated in section 8-802 of the Code of Civil Procedure (735 ILCS 5/8-802 (West 2018)). For the reasons below, we affirm.

¶ 3     Defendant was charged with one count of predatory criminal sexual assault of a child for allegedly committing an act of sexual penetration upon his four-year-old daughter, J.T., by making contact between his penis and her sex organ. The charge alleged that the act occurred between March 1, 2012, and November 30, 2013.

¶ 4     On April 15, 2019, the day defendant's jury trial was scheduled to begin, defendant failed to appear in court. Defense counsel stated that defendant's phone had been disconnected and his family was unaware of his whereabouts. The trial court noted that it had twice admonished defendant that he was required to appear for every court date, and that he could be tried and sentenced *in absentia*.

¶ 5     Defendant's jury trial ultimately began on July 8, 2019. Prior to the start of trial, the State presented testimony from two investigators with the Cook County State's Attorney's Office regarding their unsuccessful attempts to locate defendant. The prosecutor also pointed out that the clerk of the circuit court had sent notice to defendant via certified mail informing him of the trial date and that the trial would commence without him if he failed to appear. The trial court found that defendant's failure to appear in court was willful and proceeded with the trial in his absence.

¶ 6     At trial, Jasmine T. testified that J.T. was born April 6, 2009. Defendant is J.T.'s father and was born February 13, 1990. Jasmine and defendant were married in July 2011. They initially lived in Rantoul, Illinois with their two children and Jasmine's first child. In mid-2012, the couple separated. Defendant moved to Chicago and lived with his cousin, Vanessa Valentin. Vanessa had

a young son, J.,[1] who was "a little bit older" than J.T. During that time, J.T. and her brother, E.T., visited defendant at Vanessa's house every other weekend.

¶ 7    In November 2013, J.T. told Jasmine that she could not use the restroom because her "private area" hurt. Jasmine observed that J.T.'s vagina was "very red and burned." J.T. was four years old. Jasmine took J.T. to the emergency room at St. Mary's Hospital. J.T. tested positive for chlamydia. The same day or the next day, the Department of Children and Family Services (DCFS) told Jasmine that she and defendant had to get tested for chlamydia. Jasmine got tested within a few days. Defendant did not get tested with her.

¶ 8    Shortly thereafter, Jasmine brought J.T. to the Children's Advocacy Center (CAC) for an interview. DCFS informed Jasmine that J.T. had stated during the interview that her cousin, J., had done something to her.

¶ 9    About two weeks later, Jasmine spoke with defendant over the phone and asked him if he had gotten tested for chlamydia. Defendant told Jasmine he had not. By the end of 2013, no one had been charged with an offense against J.T.

¶ 10    At the end of 2013 or beginning of 2014, DCFS informed Jasmine that defendant had tested negative for chlamydia. Consequently, Jasmine and defendant reconciled and resumed living together with their children. Jasmine and defendant resumed having intimate relations.

¶ 11    On a Saturday in October 2016, Jasmine took J.T. to her pediatrician's office for a routine school physical. J.T. was examined by the physician's assistant, Susana Guzman. Jasmine told Guzman she was concerned because J.T. recently had vaginal discharge and had a history of chlamydia. Guzman tested J.T. for chlamydia.

---

[1] J.'s last name or initial does not appear in the record.

¶ 12    The following Monday, the doctor's office informed Jasmine that J.T. had again tested positive for chlamydia and advised her to bring J.T. in immediately for treatment. Jasmine and defendant brought J.T. in that day. DCFS also contacted Jasmine that day. A day or two later, Jasmine was tested for chlamydia. During the week, Jasmine brought J.T. to the CAC for an interview. J.T. did not disclose anyone as a possible abuser. On Saturday, Jasmine and defendant learned they both tested positive for chlamydia. The trial court overruled defense counsel's hearsay objection. Jasmine testified that defendant moved out of their house that night.

¶ 13    Shortly thereafter, Jasmine asked J.T. to tell her what happened. Jasmine told J.T. that if she did not speak up, her father, defendant, could get in trouble for something he did not do. J.T. told Jasmine that defendant did do something to her when she visited him at Vanessa's house. J.T. told Jasmine that while she was sleeping, defendant put his private part in her private part. J.T. told Jasmine that she began crying and asked defendant to stop but he did not.

¶ 14    Jasmine testified that she immediately went to the police station and filed a sexual assault report. Jasmine and J.T. returned to the CAC to speak with their DCFS caseworker so they could conduct another interview. Jasmine never told J.T. what to say during the interview. Jasmine was still married to defendant at the time of trial because she could not afford to file for divorce.

¶ 15    On cross-examination, Jasmine testified that in 2013 she moved back to Chicago and rented an apartment with her brother, Calvin[2], and his girlfriend. Jasmine had another brother named Jonathan Rodriguez. Jasmine's cousin, Enrique Mendez, lived with her mother.

¶ 16    Pursuant to defense counsel's questioning, Jasmine confirmed that shortly after November 22, 2013, DCFS entered "an order" that anyone who had contact with J.T. was "ordered to be

_____

[2] Calvin's last name does not appear in the record.

- 4 -

tested" for chlamydia. That order was not "limited" to defendant. Jasmine's brother Calvin and Alberto Rosado both tested negative. Jasmine could not recall if DCFS prohibited J.T. from going to Jasmine's mother's house. Nor did Jasmine recall if Mendez had been tested at that time because he did not move into her mother's house until 2016. Jasmine acknowledged that during the CAC interview in 2013 and the first CAC interview in 2016, J.T. identified her young cousin, J., as the person who touched her.

¶ 17   J.T. testified that she was born April 6, 2009, and was 10 years old at the time of trial. J.T. confirmed she knew the difference between a truth and a lie and would only tell the truth in court. Defendant was J.T.'s father. J.T. testified that when she was younger, she sometimes slept overnight at Vanessa's house. Defendant and J.T.'s brother, E.T., slept in the same bedroom with J.T. at Vanessa's house. One night at Vanessa's house, J.T. awoke in the middle of the night because her dad was touching her "private part" with his "private part." J.T. described her private part as being in front where she goes "pee" and defendant's private part as what he uses "to pee." When J.T. went to bed that night, she was wearing a pajama shirt and pants with underwear underneath. When J.T. awoke, her pajama pants and underwear were down. Defendant touched J.T. with his private part for about five seconds. J.T. asked defendant to stop. Defendant stopped and left the room. J.T. fell asleep. The next day, she did not tell anyone what happened because she was afraid she would get in trouble from her mom and dad.

¶ 18   Sometime thereafter, J.T.'s private part hurt and was stinging in the same area where defendant had touched her with his private part. It hurt more when she went "pee." J.T. told her mom that it hurt when she "peed," and her mom took her to the doctor. After seeing the doctor, J.T. went to a colorful building with an interview room. During her first interview, J.T. did not tell

the person what defendant did to her because she was afraid she would get in trouble and her mom would be mad at her. Instead, J.T. said J. touched her.

¶ 19    J.T. testified that when she was a little older, she went to see a lady doctor. After seeing that doctor, J.T. returned to the same building for another interview. J.T. told a woman there what defendant did to her. J.T. could not recall what she said during the interview but remembered saying defendant was the person who did something to her. J.T. was no longer afraid to say it was defendant because she had already told her mom what happened, and she did not get in trouble.

¶ 20    On cross-examination, J.T. acknowledged that at the interviews, she told the people that she knew the difference between the truth and a lie and said J. had done something to her private part. She also told them defendant had not done anything to her. J.T. acknowledged that she spoke with several people, including her mom, about the case and her testimony. When J.T. told her mom what defendant did, her mom became angry with defendant.

¶ 21    On redirect examination, J.T. testified that no one told her what to say in court. She confirmed that her trial testimony was the truth.

¶ 22    Dr. Katherine Schroeder testified that on November 23, 2013, she treated J.T. in the emergency room of St. Mary's Hospital for chlamydia. A lab test taken the previous day indicated J.T. was positive for the disease. Hospital personnel notified DCFS that day of J.T.'s health status. After J.T.'s treatment was complete, she waited at the hospital for DCFS to arrive.

¶ 23    On cross-examination, Schroeder explained that symptoms of chlamydia manifest one to two weeks after the disease is acquired. There is no method to determine how a person acquired the disease.

¶ 24 Dr. Lauren Bence testified that on November 23, 2013, she took over J.T.'s care from Schroeder following a shift change at St. Mary's Hospital. Schroeder told Bence that J.T. had tested positive for chlamydia and was treated with antibiotics. Schroeder also told Bence that they were waiting for DCFS to return the hospital's call. Bence testified that it was her duty to ensure DCFS had been contacted and that they had a "safe plan." DCFS was supposed to go to the family's home that day to evaluate the safety situation in the home. However, DCFS informed the hospital that it would not be able to evaluate the home until the following morning. Bence spoke with Jasmine to ensure that no one in the home posed a threat to J.T.

¶ 25 The next day, November 24, 2013, Bence and physician's assistant Danice Sher were seeing patients in the emergency room with Bence overseeing the care given to all the patients. Defendant came to the hospital that day complaining of symptoms that were highly suspicious of him having an STD.

¶ 26 Danice Sher testified that on November 24, 2013, she was working with Bence in the emergency room at St. Mary's Hospital. Defendant came to the emergency room complaining of stinging when he urinated. Defendant told Sher he recently had an unprotected sexual encounter which, coupled with his symptom, raised suspicion that he had an STD. Sher examined defendant, ordered tests for gonorrhea and chlamydia, and administered medication to him to treat the STDs.

¶ 27 Physician's assistant Richard Montes testified that on November 26, 2013, he was working in the emergency room of St. Mary's Hospital and received lab test results indicating defendant was positive for chlamydia. Montes called defendant and informed him of his positive test result. Montes advised defendant to contact any sexual partners he may have had and to tell them to get treated for chlamydia. Defendant confirmed he understood and said he had no questions.

¶ 28    Nurse practitioner Susana Guzman testified that on October 8, 2016, she was working at the Young Family Health Associates clinic when Jasmine brought J.T. in for a physical exam. Jasmine told Guzman J.T. had been a victim of abuse in 2013 and had tested positive for chlamydia and herpes. She also said J.T. recently had vaginal discharge. Guzman tested J.T. for gonorrhea and chlamydia. A few days later, Guzman received the test results which indicated J.T. was positive for chlamydia. Guzman called Jasmine and told her to bring J.T. back to the clinic. Guzman did not tell Jasmine the test results over the phone.

¶ 29    Jasmine arrived at the clinic with J.T. and defendant. Guzman spoke with Jasmine alone and informed her of the positive chlamydia result. Guzman then administered medication to J.T.

¶ 30    Guzman notified DCFS that day of J.T.'s positive chlamydia test. As part of that process, all the family members in J.T.'s household were required to be tested for chlamydia, including Jasmine and defendant, who were tested the next day. A few days later, Guzman received the test results for Jasmine and defendant, and they returned to the clinic together. Both had tested positive for chlamydia. Guzman spoke with Jasmine about DCFS's involvement and told her defendant was not allowed to be in the home during "the investigation."

¶ 31    Guzman testified that defendant adamantly denied having any sexual contact with J.T. but admitted he had unprotected sex with someone other than Jasmine. When looking at defendant's medical history, Guzman noticed he had tested positive for chlamydia in 2013. Consequently, Guzman notified DCFS and the CAC.

¶ 32    Lynn Aladeen, forensic interviewer with the CAC, testified that on October 24, 2016, she interviewed J.T., who was about seven years old. Prior to the interview, Aladeen met with the people investigating J.T.'s case, including Cynthia Pettis from DCFS, Chicago police detective

Emily Rodriguez, and Assistant State's Attorney Jeremiah Lewellen. Aladeen's interview with J.T. was videorecorded. Aladeen testified that the recording truly and accurately reflected the interview. The videorecording was published to the jury.

¶ 33    This court viewed the video of the interview. Therein, J.T. told Aladeen that a long time ago, she was sleeping at Vanessa's house in a bed she shared with her dad and her brother, E.T. J.T. woke up when her dad put his private part in her private part. J.T. stated that she began crying because her private part was hurting. J.T. stated that her private part was the part of her body where girls go "pee." J.T. said her dad had pulled down her clothes while she was sleeping, and he pulled them back up when she woke up. J.T. told Aladeen that her dad told her not to tell anyone.

¶ 34    Chicago police detective Emily Rodriguez testified that on November 25, 2013, she was assigned to investigate J.T.'s case. That day, Rodriguez received a DCFS hotline report that J.T., a four-year-old, had contracted chlamydia. Someone had also filed a case report with the police. Rodriguez contacted Jasmine and told her she would be the detective in charge of J.T.'s case and that someone from the intake office at the CAC would contact her to schedule a forensic interview for J.T. The forensic interview was conducted on December 2, 2013. During that interview, J.T. named her six-year-old cousin, J., as the person who touched her. J.T. did not name any other possible offenders and Rodriguez had no other lead. Thus, the investigation was suspended.

¶ 35    Nearly three years later, on October 18, 2016, Rodriguez received a report from the DCFS hotline that J.T. had contracted chlamydia again. J.T. underwent a second forensic interview at the CAC that same day. J.T. again said her cousin, J., had touched her. Rodriguez told Jasmine to call her if any new information became available.

¶ 36  On October 24, 2016, Jasmine told Rodriguez that DCFS directed Jasmine and defendant to get tested for chlamydia. They both tested positive. Jasmine also told Rodriguez about a conversation she had with J.T. Based on that conversation, Aladeen conducted a forensic interview with J.T. that same day at the CAC. During that interview, J.T. named defendant as the person who had sexually abused her. Around the same time of the interview, Rodriguez requested J.T.'s past medical records. A nurse told Rodriguez that defendant had been treated for chlamydia in 2013. Rodriguez then filed grand jury subpoenas for defendant's medial records from November 2013 through October 2016. On November 2, 2016, Rodriguez received defendant's medical records from the hospital. On November 8, 2016, defendant was arrested.

¶ 37  On November 9, 2016, Rodriguez and her partner, detective Manuel De La Torre, interviewed defendant while he was in custody. The interview was videorecorded. After being advised of his *Miranda* rights, defendant admitted he made contact between his penis and J.T.'s vagina. The videorecording of defendant's interview was published to the jury.

¶ 38  This court viewed the video of defendant's interview with the police. Therein, after being advised of his *Miranda* rights, defendant told the detectives that both he and J.T. tested positive for chlamydia. Defendant told the detectives that the incident happened when he was living at his cousin Vanessa's house. Defendant had his own room at Vanessa's. J.T. and E.T. were asleep in the room. Defendant was "frustrated" because a couple of girls were supposed to come over that night, but they did not come. Defendant stated that he got drunk and was smoking. Defendant began crying and told the detectives he made a mistake. Defendant stated that while J.T. was sleeping, he removed her clothes. He then "took out" his "private part." Defendant acknowledged to Detective Rodriguez that he was referring to his penis. Defendant stated that he rubbed his penis

on J.T.'s "private area" for a couple minutes. He acknowledged to the detectives that he meant J.T.'s vagina. Defendant said he stopped because he realized what he was doing was wrong and J.T. woke up. Defendant said he left the room. J.T. put her clothes back on herself. Defendant told the detectives that he later told J.T. that he was sorry and that it would never happen again.

¶ 39    Defendant told the detectives that he did not know how J.T. got chlamydia a second time. He swore that he never abused her again. Defendant stated that he went to the hospital in 2013 because it burned when he went to the bathroom. At that time, he knew that Jasmine had taken J.T. to the hospital. Defendant stated that he tested positive for chlamydia in 2013 and received medical treatment. Detective De La Torre asked defendant why he got tested again in 2016. Defendant stated that DCFS and the doctors told the family that everyone in the house had to get tested. Defendant maintained that he did not give J.T. chlamydia again in 2016.

¶ 40    On cross-examination, Rodriguez testified that she never interviewed Enrique Mendez. Rodriguez did not recall interviewing defendant on November 10, 2016, but acknowledged the interview was reflected in a "crimes printout" from the State's Attorney's Office. She did not recall defendant telling her that the sexual contact incident at Vanessa's house occurred in 2014.

¶ 41    The State presented defendant's birth certificate indicating he was born February 13, 1990.

¶ 42    Defense counsel presented a stipulation that Marilyn Soto, a forensic interviewer at the CAC, interviewed J.T. on December 2, 2013, which was videorecorded. Counsel presented a second stipulation that Elizabeth Perez, a forensic interviewer at the CAC, interviewed J.T. on October 18, 2016, which was videorecorded. Defense counsel published videos of both interviews to the jury.

¶ 43    This court viewed the two videos presented by the defense. In both interviews, J.T. names J., whom she says is six years old, as the only person who touched her "private part."

¶ 44    The jury found defendant guilty beyond a reasonable doubt of predatory criminal sexual assault of a child. Defense counsel filed a motion for a new trial which the trial court denied. On August 1, 2019, the trial court sentenced defendant, *in absentia*, to 55 years' imprisonment.

¶ 45    More than a year later, on November 19, 2020, defendant was arrested. Defense counsel moved for a hearing to determine if defendant was entitled to a new trial or sentencing hearing pursuant to section 115-4.1(e) of the Code of Criminal Procedure (725 ILCS 5/115-4.1(e) (West 2020)). At that hearing, defendant testified that he did not appear at his trial or sentencing because he was afraid. Defendant acknowledged that the trial court had admonished him that if he did not appear in court, he could be tried and sentenced *in absentia*. The trial court found that defendant had purposefully absented himself from the court proceedings and therefore was not entitled to a new trial or sentencing hearing.

¶ 46    On appeal, defendant contends his trial counsel rendered ineffective assistance when counsel failed to challenge the admission of defendant's positive test results for chlamydia from 2013 and 2016. Defendant argues that the State was not entitled to admit such evidence where it did not fall under any of the exceptions to the physician-patient privilege enumerated in section 8-802 of the Code of Civil Procedure (Code) (735 ILCS 5/8-802 (West 2018)). Therefore, a motion to bar the evidence would have been granted. Defendant further claims he was prejudiced by counsel's failure to have the evidence barred because the State used it as an integral part of its otherwise weak case by repeatedly eliciting testimony about the positive results from six witnesses and referring to the results in its arguments to the jury, which affected the outcome of the trial.

¶ 47    The State responds that trial counsel did not render ineffective assistance because defendant's positive test results for chlamydia were admissible pursuant to subsection 8-802(4), which allows a physician to disclose a patient's medical information in all actions brought against a patient where the patient's physical condition is at issue. The State further argues defendant was not prejudiced by the admission of his chlamydia diagnoses where the 2013 positive result was properly admitted through Detective Rodriguez's testimony, the 2016 result was properly admitted through the testimony of lay witnesses, and the evidence of defendant's guilt was overwhelming.

¶ 48    Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To support a claim of ineffective assistance of trial counsel, defendant must demonstrate that counsel's representation was deficient, and as a result, he suffered prejudice that deprived him of a fair proceeding. *Strickland*, 466 U.S. at 687. Specifically, defendant must show that counsel's performance was objectively unreasonable and that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Veach*, 2017 IL 120649, ¶ 30.

¶ 49    Generally, whether counsel objects to the admission of evidence is a strategic decision that does not serve as a basis for a claim of ineffective assistance of counsel. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Counsel may be found ineffective where there was no valid reason for failing to object to evidence that was, in fact, inadmissible. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 63. However, if the evidence was admissible, an objection would have been futile, and thus, counsel's failure to object cannot be deemed ineffective assistance. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 33.

¶ 50     In this case, to determine whether counsel was ineffective for failing to challenge the admissibility of defendant's positive test results for chlamydia, we must first determine whether the evidence was admissible under an exception to the physician-patient privilege. This is a question of statutory interpretation.

¶ 51     The main purpose of statutory interpretation is to ascertain and give effect to the intent of the legislature. *People v. Leib*, 2022 IL 126645, ¶ 28. "The most reliable indicator of the legislator's intent is the language of the statute itself, which must be given its plain and ordinary meaning." *People v. Grant*, 2022 IL 126824, ¶ 24. When the language of a statute is clear and unambiguous, courts must construe the statute by its plain language and may not depart from the terms of the statute. *Id.*

¶ 52     "Under the guise of construction, a court may not supply omissions, remedy defects, annex new provisions, substitute different provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of language employed in the statute." (Internal quotation marks omitted.) *Id.* ¶ 25. Nor may a court, under the pretext of statutory construction, "correct" a perceived oversight or error by the legislature. *Id.* In addition, when determining the legislative intent of a statutory provision, it is often necessary to consider the provisions of other statutes that relate to the same subject matter. *Id.*

¶ 53     The physician-patient privilege statute provides, in relevant part, as follows:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient, except only *** (4) in all actions brought by or against the patient *** wherein the patient's physical or mental condition is an issue, ***

(7) in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act[.]" 735 ILCS 5/8-802 (West 2018).

¶ 54    Defendant states that subsections (4) and (7) are the only two exceptions in the statute which might possibly apply in this case but argues neither is applicable. Defendant relies primarily upon the reasoning of the Third District in *People v. Bons*, 2021 IL App (3d) 180464.

¶ 55    In *Bons*, the defendant was charged with predatory criminal sexual assault of a child. *Bons*, 2021 IL App (3d) 180464, ¶ 3. The defendant filed a motion *in limine* to bar any evidence at trial regarding his chlamydia diagnosis. The hearing on that motion was continued for the State to address the foundational requirements to admit the defendant's chlamydia diagnosis. *Id.* ¶ 4. The State subpoenaed the hospital for the defendant's medical records and the defendant moved to quash the subpoena. *Id.* ¶ 5. The defendant argued that he did not consent to the release of his medical records and that none of the statutory exceptions to the physician-patient privilege applied. *Id.* ¶ 6. Specifically, the defendant argued that the exception under subsection 8-802(4) did not apply because his medical condition was not an element of the offense and not at issue. He further argued that subsection (7) did not apply simply because a DCFS report was filed. The defendant claimed subsection (7) required a physician to disclose findings made during an evaluation of a child after a DCFS report was made. *Id.*

¶ 56    The State responded that subsection (4) applied because the defendant's medical condition was relevant where he and the child were both diagnosed with chlamydia. It further argued the defendant's condition was evidence of a sexual act and, therefore, evidence of an element of the offense. *Id.* ¶ 7. The State also argued that subsection (7) applied because the criminal proceeding arose from a report filed under the Abused and Neglected Child Reporting Act (Act). *Id.* ¶ 8.

¶ 57    The trial court found the defendant's medical records admissible under subsections (4) and (7). Under (4), the court found the defendant's medical condition was at issue due to the sexual nature of the offense. It further found that a physician could disclose protected health information any time there was a proceeding against a patient whose physical or mental condition was at issue. The court also found subsection (7) applied because the criminal case arose from the filing of a DCFS report. *Id.* ¶ 9. Following a bench trial, the court found the defendant guilty. *Id.* ¶ 27.

¶ 58    On appeal, the defendant argued that the trial court erred when it admitted evidence of his medical condition under subsections 8-802 (4) and (7) of the Code. *Id.* ¶ 30. The Third District relied on the reasoning of our supreme court in *Palm v. Holocker*, 2018 IL 123152. The *Bons* court found two of *Palm's* findings relevant to its analysis of the applicability of subsection (4). First, it noted that *Palm* found the physician-patient privilege belonged to the patient and, therefore, only the patient could waive it by putting his physical or mental condition at issue. Second, *Bons* noted that *Palm* found that a broad application of subsection (4) which would allow disclosure in every case in which a patient's medical condition was "relevant" would render the other 13 exceptions in the statute unnecessary. *Bons* quoted the supreme court's finding that " 'the legislature's intent in enacting subsection (4) was to codify the near-universally recognized principle of waiver by implied consent[.]' " *Bons*, 2021 IL App (3d) 180464, ¶ 37 (quoting *Palm*, 2018 IL 123152, ¶ 33).

¶ 59    *Bons* further pointed out that the supreme court stated in *Palm* that it expressed no opinion about the criminal cases which held that subsection (4) applies where the legislature made a party's physical or mental condition an element of an offense. *Id. Bons* reasoned that by doing so, the supreme court left open the possibility that *Palm's* rationale applied to the case before it where the defendant's physical or mental condition was not an element of the offense. *Id.* ¶ 38.

¶ 60    Consequently, *Bons* found that, although the defendant's physical condition was relevant to and highly probative of the element of sexual contact, that alone was insufficient to invoke the exception under subsection (4). Further, *Bons* found that the State could not place the defendant's medical condition at issue by alleging he had an STD to force him to waive the privilege, thereby waiving the privilege for him. *Bons* found that the criminal cases which found subsection (4) applicable involved charges where the defendant's physical or mental state was an element of the offense and, thus, were distinct from the case before it. *Id.* ¶ 39. Accordingly, *Bons* concluded that the exception under subsection (4) did not apply. *Id.* ¶ 38.

¶ 61    As to subsection (7), *Bons* stated that its purpose was to protect children by permitting the disclosure of reports of abuse and neglect under the Act. *Bons* found that the purpose of the Act was satisfied in the case before it when a school counselor made a sexual abuse report to DCFS. *Bons* found that the medical records at issue did not arise from making a report under the Act and, therefore, the exception under subsection (7) did not apply. *Id.* ¶ 43.

¶ 62    *Bons* further found that the exception did not apply to the testimony of a medical professional regarding the defendant's medical condition because the medical professional did not make a report under the Act. The *Bons* court explained its reasoning as follows:

> "The plain language of the statute excepts from the physician-patient privilege information
> 'arising' from the filing of a report in compliance with the Act. *Id.* Here, there is no
> indication that defendant's medical records regarding his chlamydia diagnosis and
> treatment *arose from* the DCFS investigation or report. The record indicates that defendant
> independently sought medical care *** approximately two weeks after [the victim]
> reported the sexual abuse to [the school counselor]. Additionally, the State obtained

defendant's medical records through its own investigation and by subpoena, rather than through the DCFS investigation and report. Since defendant's medical condition information was not procured from a DCFS report or investigation, we reject the State's assertion that subsection 8-802(7) excepts the information from the physician-patient privilege." (Emphasis in original.) *Id.* ¶ 44.

*Bons* concluded that the State's reading of subsection (7) was "overly broad" because it would automatically waive the physician-patient privilege of all individuals who were connected to or implicated in a report filed under the Act, thereby rendering the other 13 exceptions meaningless in cases that involve or relate to a DCFS report. *Id.* ¶ 45.

¶ 63    Although the Third District found that the exceptions under subsections (4) and (7) did not apply in *Bons*, it concluded that the admission of the defendant's chlamydia diagnosis was harmless error because the evidence against him was overwhelming. *Id.* ¶ 47.

¶ 64    Here, defendant argues that this court should follow the reasoning in *Bons* and conclude that the exceptions under subsections (4) and (7) do not apply in this case. Defendant asserts that subsection (4) does not apply because defendant's physical condition, although relevant, was not "an issue" where it was not an element of the offense, and the State cannot place his medical condition at issue by alleging he had an STD to force him to waive his privilege. Defendant further argues subsection (7) does not apply because the purpose of that exception is to permit disclosure of child abuse, which was satisfied when Schroeder reported J.T.'s chlamydia diagnosis to DCFS in 2013, and Guzman did so in 2016. Defendant argues that, similar to *Bons*, in 2013, he sought medical treatment for his condition independently, and his positive chlamydia test result was procured by the State through a subpoena rather than a DCFS report.

¶ 65     The State responds that the exception under subsection (4) applies in this case. The State asserts that *Bons*'s interpretation of subsection (4) was incorrect because it was contrary to the plain meaning of the language of the statute and against prior precedent. The State disagrees with *Bons*'s finding that the phrase "at issue" means that a defendant's physical or mental condition must be an element of the offense for the exception to apply. The State argues that *Bons* read exceptions, limitations, or conditions into the statute that conflict with the legislative intent. The State points out that, in *Palm*, the supreme court noted there was a conflict regarding the application of subsection (4) in civil and criminal cases. *Palm* found that in civil cases, the courts held that only the patient could waive his privilege by putting his physical or mental condition at issue, but in criminal cases, the courts allowed the State to waive a defendant's privilege by putting his physical or mental condition at issue. *Palm*, 2018 IL 123152, ¶ 24. The State also notes that *Palm* found that the legislature had "acquiesced" in the conflicting interpretations of the statute by amending it without addressing the varied interpretations. *Id.* ¶ 31. The State argues that, here, defendant's physical condition was in issue because the evidence that defendant tested positive for chlamydia at the same time as J.T. tended to prove that he had sexual contact with her. The State did not address subsection (7) in its brief.

¶ 66     *Palm* is a personal injury negligence case wherein the defendant struck the plaintiff, a pedestrian, with his vehicle. *Id.* ¶ 4. The issue before the court was whether the defendant's attorney could assert the physician-patient privilege and refuse to answer two interrogatories seeking the defendant's medical information on the basis that his medical information was not an issue in the case. *Id.* ¶ 1. The appellate court held that the defendant had not affirmatively placed

his physical or mental condition at issue; therefore, the exception under subsection (4) did not apply and his medical information was protected by the privilege. *Id.* ¶ 13.

¶ 67 On appeal to the supreme court, the issue became whether a plaintiff may put a defendant's physical or mental condition at issue thereby waiving the defendant's physician-patient privilege. *Id.* ¶ 18. As noted by the State above (*supra* ¶ 77), *Palm* found a "genuine conflict between how the courts have applied subsection (4) in civil and criminal cases" with the State being allowed to put a defendant's medical condition at issue in criminal cases. *Id.* ¶ 24. The court noted that in the previous version of the statute, subsection (4) applied only to civil cases. *Id.* n.6. The exception was amended when the statute was recodified as part of the Illinois Compiled Statutes at which time its application was changed from "in all civil suits" to "in all actions." *Id.*

¶ 68 *Palm* stated that the purpose of the physician-patient privilege is to encourage patients to make a full disclosure of all their medical facts to the physician to ensure the best diagnosis and outcome for the patient. *Id.* ¶ 34. The court then explained that when a patient is not seeking medical treatment, but sees a physician for another purpose, such as obtaining a report to maintain his driving privileges, the physician-patient privilege does not apply. *Id.* In referencing several authorities, *Palm* included the following quote:

> " 'As a general rule, the relationship of physician and patient does not exist unless the physician's consultation with, or attendance upon, the prospective patient is with a view to protective, alleviative, or curative treatment. *** There is no privilege as to information acquired by a physician through the physical or mental examination of a person unless it is made in contemplation of, and as preparation for, medical care and treatment; hence, if the physician's examination of, or conference with, the person is for a purpose other than

prescribing or doing any act for him in the way of medical care or treatment, the physician is not disqualified as a witness and may disclose any information so acquired concerning such person, since the relation of physician and patient does not exist under such circumstances.' " *Id.* ¶ 35 (quoting Clinton DeWitt, Privileged Communications Between Physician and Patient 104-05 (1958)).

¶ 69   *Palm* "urge[d] the legislature to address section 8-802(4) and to make its intentions clear." *Id.* ¶ 39. It specifically requested that the legislature "clarify how something becomes 'an issue' for purposes of this section, whether one party may put another party's physical or mental condition at issue, and if the rule is any different for civil and criminal cases." *Id.* However, subsection (4) has not yet been amended by the legislature.

¶ 70   Nevertheless, this court can affirm on any basis supported by the record.  See *People v. Johnson*, 208 Ill. 2d 118, 129 (2003) ('The rule that a lower court decision may be sustained on any ground of record is both universally recognized and long established.")  Here, in accordance with *Palm*, we find that the evidence that defendant tested positive for chlamydia in 2016 was not subject to the physician-patient privilege. The record shows that on October 8, 2016, J.T. went to the clinic for a routine physical exam and was seen by Nurse Guzman. Jasmine told Guzman that J.T. previously tested positive for chlamydia and recently had vaginal discharge. Guzman tested J.T. for gonorrhea and chlamydia. A few days later, Guzman received the test results which indicated J.T. was positive for chlamydia. Guzman notified DCFS that day of J.T.'s positive test. Guzman testified that, as part of that process, all the members of J.T.'s household were required to be tested for chlamydia, including defendant and Jasmine, who were both tested the next day. A few days later, Guzman received the test results which indicated that both defendant and Jasmine

had tested positive. The record further shows that during the detectives' interview with defendant, De La Torre asked defendant why he got tested for chlamydia again in 2016. Defendant replied that DCFS and the doctors told the family that everyone in the house had to get tested.

¶ 71    The record therefore shows that defendant was tested for chlamydia in October 2016 not for the purpose of seeking medical treatment, but because he was ordered to do so by DCFS. There is no indication in the record that defendant was complaining of symptoms in 2016. He did not go to the clinic independently, but instead, went with Jasmine for the sole purpose of submitting to a chlamydia test because they were ordered to do so. Guzman was treating J.T., not defendant. There was no physician-patient relationship between Guzman and defendant. Thus, there was no privilege. *Palm*, 2018 IL 123152, ¶¶ 34-35.

¶ 72    Since the evidence of defendant's 2016 positive chlamydia test was not subject to the physician-patient privilege, the evidence was admissible. Any attempt by counsel to bar the evidence under the privilege would have been futile. Accordingly, counsel's failure to challenge or object to the admission of the evidence did not constitute ineffective assistance. *Lucious*, 2016 IL App (1st) 141127, ¶ 33.

¶ 73    As for defendant's chlamydia diagnosis from 2013, we find that evidence was admissible under the exception provided in subsection (7), which allows a physician to share privileged medical information "in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act[.]" 735 ILCS 5/8-802(7) (West 2018). The language of this exception is clear and unambiguous. Therefore, we must construe the statute by its plain language, and we may not depart from its terms or read into it any limitations or conditions

that would change the plain meaning of the language employed in the statute. *Grant*, 2022 IL 126824, ¶ 24.

¶ 74    Here, the record shows that on November 24, 2013, defendant went to the emergency room complaining of stinging when he urinated and seeking treatment for his condition. On November 26, 2013, defendant's lab results indicated he tested positive for chlamydia. Under those circumstances, defendant's medical information, which was obtained by Dr. Bence and physician assistants Sher and Montes for the purpose of treating defendant's medical condition, was information that is normally confidential and protected by the physician-patient privilege. 735 ILCS 5/8-802. However, this case is a criminal action that arose from the filing of a report with DCFS in compliance with the Act. Accordingly, pursuant to the plain language of the exception in subsection (7), Bence, Sher, and Montes were permitted to disclose defendant's chlamydia diagnosis at trial.

¶ 75    We recognize that in *Bons*, the Third District reached an opposite conclusion. *Bons* found that the plain language of the statute provided an exception for "information 'arising' from the filing of a report in compliance with the Act." *Bons*, 2021 IL App (3d) 180464, ¶ 44. *Bons* noted that the defendant in that case independently sought medical care. *Id.* Consequently, the court concluded that because the defendant's medical records did not arise from the filing of a report under the Act, the exception under subsection (7) did not apply. *Id.* ¶¶ 43-44. *Bons* further found that because the State obtained the defendant's medical records through its own investigation rather than from a DCFS report or investigation, the exception did not apply. *Id.* ¶ 44. In addition, *Bons* found that applying the exception to all individuals implicated in a report filed under the Act

would be an "overly broad" reading of the statute and would render the other 13 exceptions to the privilege meaningless in cases involving a DCFS report. *Id.* ¶ 45.

¶ 76 We disagree with the interpretation and reasoning in *Bons*. First, the plain language of the statute does not provide an exception for "information" that arises from the filing of a report in compliance with the Act. Instead, the plain language provides an exception "*in actions, civil or criminal*, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act[.]" (Emphasis added.) 735 ILCS 5/8-802(7) (West 2018). Thus, the plain language of the statute clearly provides that the exception under subsection (7) is not based on the origin of the medical information, but rather, is based on where or in what type of proceedings the information is being disclosed. In fact, all 14 of the exceptions enumerated in the statute address specific proceedings or circumstances where the otherwise privileged medical information could be disclosed. See 735 ILCS 5/8-802 (West 2018). As applicable in this case, in a criminal action that arises from the filing of a DCFS report, medical information that would usually be considered confidential under the physician-patient privilege may be disclosed.

¶ 77 Second, *Bons*'s reasoning that the exception does not apply where a defendant independently sought medical treatment and his medical records did not arise from the filing of a DCFS report is flawed. As discussed above, the privilege only exists where a person has sought medical treatment from a physician and, hence, a physician-patient relationship exists. It therefore follows that the 14 exceptions to the privilege apply only where a physician-patient relationship exists. If a defendant's medical records arise from the filing of a DCFS report, as they did here in 2016, there is no physician-patient relationship and, thus, no privilege. In that circumstance, section 8-802 would not apply.

¶ 78     Finally, we disagree with the finding in *Bons* that applying the exception to all individuals implicated in a report filed under the Act would be an "overly broad" reading of the statute. The plain language of the exception in subsection (7) clearly states that it applies "in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act[.]" 735 ILCS 5/8-802(7) (West 2018). The plain and ordinary meaning of the language indicates that the legislature intended for the exception to sweep broadly in cases involving child abuse and neglect. This court is prohibited from adding a limitation or condition to the exception as doing so would depart from the plain meaning of the statute. *Grant*, 2022 IL 126824, ¶ 24.

¶ 79     Defendant's chlamydia diagnosis from 2013 was admissible under the exception provided in subsection (7). Any attempt by trial counsel to bar the evidence under the physician-patient privilege would have been futile. Accordingly, counsel's failure to challenge or object to the admission of the evidence did not constitute ineffective assistance. *Lucious*, 2016 IL App (1st) 141127, ¶ 33.

¶ 80     Based on our conclusion, we need not consider whether defendant's chlamydia diagnosis from 2013 could also have been admitted under the exception in subsection (4). In *Palm*, our supreme court "urge[d] the legislature to address section 8-802(4) and to make its intentions clear." *Id.* ¶ 39. The legislature has not yet done so.

¶ 81     For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 82     Affirmed.