# Illinois Official Reports

## Supreme Court

---

### *People v. Torres*, 2024 IL 129289

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAMON TORRES, Appellant. |
| Docket No. | 129289 |
| Filed | March 21, 2024 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. William Raines, Judge, presiding. |
| Judgment | Judgments affirmed. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, Douglas R. Hoff, Deputy Defender, and Deepa Punjabi, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Eldad Z. Malamuth, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices                    JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.


**OPINION**

¶ 1        In this appeal we are asked to interpret the physician-patient privilege statute set out in section 8-802 of the Code of Civil Procedure (735 ILCS 5/8-802 (West 2018)). A Cook County jury found defendant, Ramon Torres, guilty of predatory criminal sexual assault of his four-year-old daughter. The State's evidence included testimony that defendant tested positive for chlamydia in 2013 and again in 2016. On appeal, defendant maintains that his trial counsel was constitutionally ineffective for failing to object to the admission of evidence of these two test results. Defendant argues that the tests results fell under the purview of the physician-patient privilege statute and that none of the statutory exceptions to the physician-patient privilege applied. Defendant, therefore, argues that the test results would have been excluded from evidence at his jury trial had his attorney objected. The appellate court disagreed and affirmed defendant's conviction and sentence. For the following reasons, we affirm the lower courts' judgments.

¶ 2                                    I. BACKGROUND

¶ 3        In December 2016, the State charged defendant with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). The child, J.T., is defendant's daughter, who was born on April 6, 2009. The State's indictment alleged that defendant made contact between his penis and J.T.'s sex organ sometime during the period from March 1, 2012, to November 30, 2013.

¶ 4        The following facts leading up to the indictment were established by evidence presented at defendant's jury trial. J.T. initially lived with both defendant and her mother, Jasmine T., until mid-2012 when defendant and Jasmine separated. After the separation, defendant moved to Chicago and lived with his cousin, Vanessa. J.T. visited defendant at Vanessa's house every other weekend.

¶ 5        On November 23, 2013, Jasmine first became aware that something had happened to J.T. when J.T. told Jasmine that she could not use the bathroom because her "private area" hurt. J.T. was four years old at this time. Jasmine took J.T. to the emergency room, and J.T. tested positive for chlamydia. The Department of Children and Family Services (DCFS) told Jasmine that both she and defendant had to be tested for chlamydia. Jasmine submitted to testing within a few days and tested negative.

¶ 6        Defendant did not submit to testing along with Jasmine. Instead, the day after Jasmine took J.T. to the emergency room, defendant also went to the emergency room by himself complaining of symptoms that were consistent with having a sexually transmitted disease (STD), including a stinging sensation when he urinated. Healthcare providers at the emergency

room tested defendant for chlamydia for purposes of treating his symptoms. Defendant's test results were positive for chlamydia, and he received medication to treat his symptoms.

¶ 7        On December 2, 2013, Jasmine took J.T. to a child advocacy center for a forensic interview. J.T. stated during the interview that her six-year-old cousin, J., had done something to her. She did not disclose that anyone else had abused her.

¶ 8        Approximately two weeks later, Jasmine asked defendant if he had been tested for chlamydia, and he stated that he had not been tested. He did not inform Jasmine that he tested positive for chlamydia from his emergency room visit. DCFS and police investigators were also unaware of defendant's chlamydia test result. Because J.T. did not name any possible offenders other than her six-year-old cousin and investigators did not have any other leads, they suspended the investigation. Therefore, by the end of 2013, no one had been charged with any offense against J.T., and according to Jasmine, DCFS had informed her that defendant had tested negative for chlamydia. Jasmine and defendant subsequently reconciled and resumed living together with J.T. and their other children.

¶ 9        In October 2016, Jasmine took J.T. to her pediatrician for a routine physical, and J.T. again tested positive for chlamydia. Therefore, DCFS again ordered both defendant and Jasmine to be tested for chlamydia. Because DCFS ordered them to do so, both defendant and Jasmine submitted to testing the next day, and they both tested positive for chlamydia. The nurse practitioner who was treating J.T., Susana Guzman, reviewed defendant's medical history and discovered that he had tested positive for chlamydia in 2013. Guzman notified DCFS of this discovery.

¶ 10        A forensic interviewer conducted a second interview with J.T. on October 18, 2016. During this interview, J.T. did not disclose anyone as a possible abuser but again said her cousin, J., had touched her. At the conclusion of the interview, the police investigator told Jasmine to call if any new information became available. A short time after this second forensic interview, Jasmine asked J.T. to tell her what happened. J.T. then told Jasmine that, while she visited defendant at Vanessa's house, defendant put his private part in her private part while she was sleeping.

¶ 11        Jasmine immediately went to the police and filed a sexual assault report, and a forensic interviewer conducted another interview of J.T. on October 24, 2016. During this third interview, J.T. reported that during a visit with defendant at Vanessa's house, while J.T. was sleeping in a bed she shared with defendant, she woke up when defendant put his private part in her private part. J.T. explained that she previously did not say what defendant did because she had been afraid of getting in trouble. She was no longer afraid because she had told Jasmine what happened and was not in trouble for it.

¶ 12        The police investigator assigned to J.T.'s case requested J.T.'s past medical records, and a nurse informed the investigator about defendant's 2013 positive test result for chlamydia. The investigator then filed grand jury subpoenas for defendant's medical records, and defendant was arrested after the investigator received the records, which included defendant's 2013 chlamydia test results.

¶ 13        After defendant's arrest, defendant agreed to be interviewed by the investigators. During the interview, defendant informed them about an incident that occurred one night when he was living at Vanessa's house and J.T. was staying overnight with him. Defendant was frustrated because a couple of girls were supposed to come over that night but they did not show up.

Defendant stated that he was drinking and "made a mistake." He explained that, while J.T. was sleeping, he removed her clothes, took out his penis, and rubbed it on her vagina for a couple of minutes. He stated that he stopped because he realized what he was doing was wrong and J.T. woke up. Defendant told the investigators that he later told J.T. that he was sorry and that it would never happen again. During this interview, defendant admitted to testing positive for chlamydia in 2013 and 2016. Defendant denied abusing J.T. in 2016 and claimed that he did not know how J.T. got chlamydia a second time in 2016. He denied giving J.T. chlamydia again in 2016.

¶ 14     Defendant told the investigators that, when he tested positive for chlamydia in 2013, he received the testing because he had gone to the hospital for medical treatment. He stated that he tested again in 2016 because DCFS and J.T.'s medical providers told the family that everyone in J.T.'s home had to be tested.

¶ 15     Defendant's jury trial began on July 8, 2019. He was tried *in absentia* when he failed to appear in court for the trial. At the jury trial, the State presented testimony from Jasmine, J.T., medical personnel who treated J.T. in 2013 and in 2016, medical personnel who treated defendant's chlamydia in 2013, and the investigators who interviewed J.T. and defendant. The State also presented portions of video recordings of the interviews of J.T. and defendant.

¶ 16     The State's evidence included testimony of defendant's positive test results for chlamydia in 2013 and 2016. Although defendant was tried *in absentia*, he was represented by counsel, and defendant's trial counsel did not object to the admission of evidence concerning the 2013 and 2016 positive tests results for chlamydia.

¶ 17     At the conclusion of the trial, the jury found defendant guilty beyond a reasonable doubt of predatory criminal sexual assault of a child, and the circuit court sentenced defendant, *in absentia*, to 55 years of imprisonment. Authorities arrested defendant more than a year later, and defendant then appealed his conviction.

¶ 18     On appeal, defendant argued that his trial counsel provided him ineffective assistance because the attorney failed to challenge the admission of defendant's 2013 and 2016 positive test results for chlamydia. 2022 IL App (1st) 210990-U, ¶ 46. Defendant argued that the test results were protected from disclosure by the physician-patient privilege statute. Specifically, the physician-patient privilege statute provides that "[n]o physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient." 735 ILCS 5/8-802 (West 2018). Defendant maintained that admitting the test results into evidence at his trial violated this statute.

¶ 19     Defendant noted that the physician-patient privilege statute includes 14 exceptions and argued that the exceptions in subsections (4) and (7) (*id.* § 8-802(4), (7)) were the only exceptions that could arguably apply in his case. 2022 IL App (1st) 210990-U, ¶ 55. Subsection (4) allows disclosure of information that would otherwise be privileged under the statute "in all actions brought by or against the patient *** wherein the patient's physical or mental condition is an issue." 735 ILCS 5/8-802(4) (West 2018). Subsection (7) allows disclosure of privileged information "in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act." *Id.* § 8-802(7); see 325 ILCS 5/1 *et seq.* (West 2018). The appellate court considered whether each test result fell under

the purview of the physician-patient privilege statute and, if so, whether any of the exceptions to the privilege applied.

¶ 20    With respect to the 2016 test results, the appellate court held that the physician-patient privilege statute did not apply at all (2022 IL App (1st) 210990-U, ¶ 72), making the exceptions to the privilege irrelevant. Specifically, the appellate court noted that defendant "was tested for chlamydia in October 2016 not for the purpose of seeking medical treatment, but because he was ordered to do so by DCFS." *Id.* ¶ 71. The appellate court stated, "There is no indication in the record that defendant was complaining of symptoms in 2016. He did not go to the clinic independently, but instead, went with Jasmine for the sole purpose of submitting to a chlamydia test because they were ordered to do so." *Id.* Therefore, the appellate court concluded, there was no physician-patient relationship connected to the 2016 test results. *Id.* ¶ 72. Accordingly, defense counsel's failure to challenge or object to the admission of the 2016 chlamydia test, on grounds that the test was protected by the physician-patient privilege, did not constitute ineffective assistance of counsel. *Id.*

¶ 21    With respect to the 2013 test results, the appellate court held that these test results were subject to the physician-patient privilege; however, the exception to the privilege set out in subsection (7) applied, which allows a physician to share privileged medical information " 'in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act.' " *Id.* ¶ 73 (quoting 735 ILCS 5/8-802(7) (West 2018)).

¶ 22    In reaching this conclusion, the appellate court explained that the 2013 test results stemmed from defendant going to the emergency room and seeking treatment for his medical conditions. *Id.* ¶ 74. Therefore, the appellate court concluded that information pertaining to the 2013 test "was information that is normally confidential and protected by the physician-patient privilege." *Id.*

¶ 23    The appellate court further explained, however, that "this case is a criminal action that arose from the filing of a report with DCFS in compliance with the [Abused and Neglected Child Reporting Act]." *Id.* "Accordingly, pursuant to the plain language of the exception in subsection (7), [defendant's healthcare providers] were permitted to disclose defendant's chlamydia diagnosis at trial." *Id.* The appellate court held that any attempt by defendant's attorney to bar evidence of the 2013 test result on grounds that it was protected by the physician-patient privilege would have been futile; therefore, counsel's failure to object to the admission of the 2013 test results cannot constitute ineffective assistance. *Id* Because the exception in subsection (7) applied, the appellate court concluded that it need not determine whether the exception in subsection (4) also applied. *Id.* ¶ 80. The appellate court affirmed defendant's conviction and sentence. *Id.* ¶ 81.

¶ 24    We granted defendant's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Oct. 1, 2021).


¶ 25                                  II. ANALYSIS

¶ 26    Criminal defendants have a constitutional right to effective assistance of counsel under both the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Here, defendant challenges the admission of the 2013 and 2016 chlamydia test results in the context of a claim that he was denied his constitutional right to effective assistance of counsel. Illinois courts evaluate claims of ineffective assistance of counsel under

the two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard).

¶ 27 Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Peterson*, 2017 IL 120331, ¶ 79. A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel. *Id.*

¶ 28 Here, defendant's ineffectiveness claim is based on his counsel's failure to object to the admission of evidence. Therefore, to satisfy the first prong of the *Strickland* standard, defendant must establish that the challenged evidence was, in fact, inadmissible. See *People v. Wilson*, 164 Ill. 2d 436, 454 (1994) (holding that an attorney's failure to make a futile objection does not constitute substandard performance); *People v. Webb*, 2023 IL 128957, ¶ 22 ("An attorney will not be deemed deficient for failing to make an argument that has no basis in the law."). Defendant cannot satisfy this requirement.

¶ 29 The physician-patient privilege did not exist at common law but was created by our legislature in 1959 by an amendment to the predecessor to the Code of Civil Procedure. *People ex rel. Department of Professional Regulation v. Manos*, 326 Ill. App. 3d 698, 705 (2001). The physician-patient privilege statute provides, in relevant part, as follows:

> "No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient, except only *** (7) in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act ***." 735 ILCS 5/8-802 (West 2018).

¶ 30 The physician-patient privilege statute "stands as a testament to the legislature's recognition of a patient's interest in maintaining confidentiality in his or her medical dealings with his or her health-care provider." *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 568 (2002). "The primary purpose of the physician-patient privilege is to encourage free disclosure between a doctor and a patient and to protect the patient from embarrassment and invasion of privacy that disclosure would entail." *Id.* at 575. The privilege, however, is not without limitations, as the legislature has delineated 14 specific exceptions in which the privilege does not apply despite the existence of a physician-patient relationship. *Id.* at 574-75. We may not limit or expand the scope of the privilege or the statutory exceptions to the privilege beyond the legislature's intent. *Id.* at 568-69 (citing *Bronson v. Washington National Insurance Co.*, 59 Ill. App. 2d 253, 261-62 (1965)).

¶ 31 Therefore, the determination of whether defendant's 2013 or 2016 chlamydia test results were inadmissible under the physician-patient privilege statute requires us to interpret the statute's meaning, and our goal is to determine and give effect to the legislature's intent. *People v. Gutman*, 2011 IL 110338, ¶ 12. The best indicator of what the legislature intended in enacting a statute is simply the plain and ordinary meaning of the terms used by the legislature in the statute itself. *People v. Grant*, 2022 IL 126824, ¶ 24. When the legislature's chosen language is clear and unambiguous, courts must give effect to the statute as written and may not alter the legislature's intent by departing from the clear and unambiguous statutory

language. *Id.* When reviewing courts are asked to interpret a statute, the task involves answering a question of law under the *de novo* standard of review. *People v. Kastman*, 2022 IL 127681, ¶ 29.

¶ 32 The plain language of the physician-patient privilege statute establishes that the statute applies only to information a physician "may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient." 735 ILCS 5/8-802 (West 2018). Accordingly, under this plain and unambiguous language, information that is acquired by a healthcare provider under circumstances other than attending a patient's medical care is not subject to this statutory privilege.

¶ 33 Therefore, in the present case, our analysis with respect to the 2016 chlamydia test results is simple. The record supports the appellate court's conclusion that defendant's 2016 test results were not acquired by healthcare providers for purposes of attending defendant as a patient, making the privilege and the exceptions to the privilege entirely irrelevant to the admissibility of the 2016 test results at defendant's trial.

¶ 34 We have previously explained that the physician-patient privilege arises when a patient knowingly seeks medical assistance from a physician, placing trust and confidence with the physician, and the physician knowingly accepts the person as a patient. *Manos*, 202 Ill. 2d at 575. Here, the record establishes that defendant submitted to chlamydia testing in October 2016 because he was ordered to do so by DCFS, not for the purpose of seeking medical treatment. Nothing in the record suggests that defendant complained of symptoms in 2016 prior to testing. He did not go to the clinic independently in 2016 to seek medical treatment, but he instead submitted to testing along with Jasmine because they were ordered to do so by DCFS and J.T.'s attending healthcare providers. The nurse practitioner who testified at defendant's trial about defendant's 2016 chlamydia test result was treating J.T., not defendant, when she learned of the test result.

¶ 35 Defendant argues that he had a physician-patient relationship with J.T.'s nurse practitioner *after* he tested positive for chlamydia because the nurse practitioner then treated him for chlamydia after she learned of his positive test results. However, for medical information to be subject to the physician-patient privilege, the statute requires that the healthcare provider had acquired the information "in attending any patient in a professional character." 735 ILCS 5/8-802 (West 2018). Here, the nurse practitioner acquired the disputed medical information (the 2016 test results) *prior* to her "attending [defendant] in a professional character." The appellate court, therefore, correctly concluded that the physician-patient privilege statute did not apply to the 2016 test results. As a result, defendant cannot establish that his trial counsel was constitutionally ineffective in failing to object to the admission of the 2016 test results on grounds that it was protected by the physician-patient privilege.

¶ 36 With respect to the 2013 test results, however, the appellate court correctly determined that the physician-patient privilege statute does apply. 2022 IL App (1st) 210990-U, ¶ 74 (defendant's lab result, which indicated he tested positive for chlamydia in November 2013, "was information that is normally confidential and protected by the physician-patient privilege"). Defendant went to the emergency room in 2013 seeking treatment for symptoms that were consistent with an STD. The medical personnel at the emergency room tested defendant for chlamydia in 2013 for the purpose of treating defendant's symptoms. Accordingly, the 2013 chlamydia test results constitute information acquired by a physician

"attending [defendant] in a professional character, necessary to enable him or her professionally to serve [defendant]." 735 ILCS 5/8-802 (West 2018).

¶ 37    The physician-patient privilege statute, therefore, applies to the 2013 test results. Nonetheless, this conclusion does not establish that defendant's trial attorney's performance was deficient for failing to object to the admission of the 2013 test results. We must determine if any of the 14 statutory exceptions to the privilege apply in this case.

¶ 38    The State argues that the appellate court below correctly determined that the exception set out in subsection (7) applies. Subsection (7) authorizes physicians to disclose information subject to the physician-patient privilege "in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act." *Id.* The present case arises from DCFS filing a report in compliance with the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 2018)). Therefore, we agree with the appellate court and the State that, under the plain language of subsection (7), the 2013 chlamydia test results were admissible even though the physician-patient privilege attached to those test results.

¶ 39    Defendant cites *People v. Bons*, 2021 IL App (3d) 180464, in support of his argument that subsection (7)'s exception does not apply in this case. In *Bons*, a defendant charged with predatory criminal sexual assault filed a motion *in limine* to bar evidence at trial concerning his chlamydia diagnosis. *Id.* ¶¶ 3-4. The State argued that subsection (7) applied because the criminal proceeding arose from a report filed under the Abused and Neglected Child Reporting Act. *Id.* ¶ 8. The defendant, however, argued that subsection (7) did not apply because that exception merely required a physician to disclose findings made during an evaluation of a child after a DCFS report was made. *Id.* ¶ 6.

¶ 40    The *Bons* court agreed with the defendant, stating that subsection (7)'s purpose was to protect children by permitting the disclosure of reports of abuse and neglect under the Abused and Neglected Child Reporting Act, although the reports may contain information that would otherwise be precluded from disclosure under the physician-patient privilege. *Id.* ¶ 43. The *Bons* court reasoned that "[t]he plain language of the statute excepts from the physician-patient privilege information 'arising' from the filing of a report in compliance with the [Abused and Neglected Child Reporting] Act." *Id.* ¶ 44. The *Bons* court, therefore, interpreted subsection (7)'s exception as not being applicable to the testimony of a healthcare provider regarding the defendant's medical condition when the testifying healthcare provider did not make a report under the Abused and Neglected Child Reporting Act. *Id.* The court stated, "Here, there is no indication that defendant's medical records regarding his chlamydia diagnosis and treatment *arose from* the DCFS investigation or report." (Emphasis in original.) *Id.* According to the *Bons* court, the defendant's medical information would be admissible under subsection (7) only if the State obtained the information through the DCFS investigation and report. *Id.*

¶ 41    In the present case, the appellate court declined to follow the reasoning set out in *Bons* and instead concluded that defendant's 2013 chlamydia test was admissible under subsection (7) because "this case is a criminal action that arose from the filing of a report with DCFS in compliance with the [Abused and Neglected Child Reporting] Act." 2022 IL App (1st) 210990-U, ¶ 74. We agree with the appellate court's analysis and, likewise, reject the *Bons* court's interpretation of subsection (7) for the reasons set out in the appellate court's analysis.

¶ 42 The plain and unambiguous[1] language of subsection (7) does not require that defendant's medical *information* must arise from the filing of a report under the Abused and Neglected Child Reporting Act for the exception to apply. Instead, subsection (7)'s exception applies to *actions* arising from the filing of the report. 735 ILCS 5/8-802(7) (West 2018). Accordingly, as the appellate court below stated, "the plain language of the statute clearly provides that the exception under subsection (7) is not based on the origin of the medical information, but rather, is based on where or in what type of proceedings the information is being disclosed." 2022 IL App (1st) 210990-U, ¶ 76. As the appellate court observed, this is true for all 14 exceptions to the physician-patient privilege. *Id.* Medical information that would normally be inadmissible under the physician-patient privilege is admissible under subsection (7)'s exception when *the action* arises from the filing of a DCFS report.

¶ 43 We agree with the appellate court's conclusion that the plain language of the statute "indicates that the legislature intended for the exception to sweep broadly in cases involving child abuse and neglect." *Id.* ¶ 78. The physician-patient privilege "is a legislative balancing between relationships that society feels should be fostered through the shield of confidentiality and the interests served by disclosure of the information." *Manos*, 202 Ill. 2d at 575-76. We cannot rebalance these public policy considerations by modifying the statutory exceptions set out by the legislature in plain language. *Id.* at 576.

¶ 44 Accordingly, we conclude that the physician-patient privilege enacted by our legislature allows the admission of information normally protected by physician-patient privilege in all actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act, including defendant's jury trial in the present case, which arose from the filing of a DCFS report. As a result, had defendant's attorney objected to the admission of the 2013 chlamydia test results, the objection would have been futile. Accordingly, defendant has not satisfied the first prong of the *Strickland* standard, and his claim of ineffective assistance of counsel fails.[2]

---

[1]Defendant argues that the split between the First District in this case and the Third District in *Bons* establishes that the statute is ambiguous. We disagree. A split in decisions interpreting a statute does not render the statute ambiguous *per se*. See, *e.g.*, *People v. Sheehan*, 168 Ill. 2d 298 (1995) (declaring a statute to be plain and unambiguous despite a disagreement between appellate court decisions); see also *Beecham v. United States*, 511 U.S. 368 (1994) (declaring a statute to be plain and unambiguous despite a disagreement between two federal circuits).

[2]We may resolve a defendant's claim of ineffective assistance of counsel by proceeding directly to the prejudice prong without addressing counsel's performance. *People v. Hale*, 2013 IL 113140, ¶ 17. Lack of prejudice renders irrelevant the issue of whether counsel's performance was deficient. Here, defendant admitted to investigators that he placed his penis in contact with J.T.'s vagina when J.T stayed with him at Vanessa's home. Under these facts, it is questionable whether defendant can satisfy the prejudice prong of the *Strickland* standard. Nonetheless, we have elected to address the first prong of the *Strickland* standard in this appeal to resolve the conflict between the First District's decision in the present case and the Third District's decision in *Bons* with respect to the proper interpretation of subsection (7) of the physician-patient privilege statute. We have also elected not to address the issue of whether defendant waived his physician-patient privilege when he admitted to testing positive to chlamydia in 2013 during police questioning.

¶ 45                            III. CONCLUSION

¶ 46        For the foregoing reasons, we affirm the lower courts' judgments.

¶ 47        Judgments affirmed.