NOTICE
Decision filed 05/12/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241351-U

NO. 5-24-1351

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 24-CF-96 |
| | ) | |
| DANTE FREEMAN, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction and sentence are affirmed where defendant's speedy trial rights were not violated, the trial court did not abuse its discretion in granting the State's motions to continue and did not err in declining to appoint new counsel to address defendant's claims of ineffective assistance of counsel following the initial *Krankel* inquiry.

¶ 2    Following a jury trial, defendant, Dante Freeman, was found guilty on eight counts of predatory criminal sexual assault involving two nine-year-old girls and was sentenced to natural life imprisonment. On appeal, defendant contends that his speedy trial rights were violated and the trial court abused its discretion by granting the State's motions to continue. Defendant also argues that the trial court erred by declining to appoint new counsel regarding defendant's claims of ineffective assistance of counsel following the *Krankel* inquiry. For the following reasons, we affirm.

1

¶ 3                           I. BACKGROUND

¶ 4      On January 23, 2024, defendant was charged, by information, with four counts of predatory criminal sexual assault, pursuant to section 11-1.40(a)(1) of the Criminal Code of 2012 (Criminal Code). 720 ILCS 5/11-1.40(a)(1) (West 2022). Defendant was arraigned, counsel was appointed, and probable cause was found. Defendant advised the court that he was arrested the previous Friday, January 19, 2024, and requested a preliminary hearing, which the court scheduled for February 14, 2024. The State's petition to deny pretrial release was called for hearing. Defense counsel requested a continuance, which was granted by the trial court and the hearing was reset for January 25, 2024.

¶ 5      On January 25, 2024, a fifth charge of predatory sexual assault was filed. Following a hearing on the petition to deny pretrial release, the trial court found that defendant should be detained. Defendant appealed that decision and this court affirmed the order of detainment. See *People v. Freeman*, 2024 IL App (5th) 240167, ¶¶ 1, 51. All five charges against defendant involved N.M., the nine-year-old daughter of defendant's girlfriend. The five charges alleged contact that included: defendant's penis in N.M.'s mouth (count 1), defendant's mouth on N.M.'s vagina (count 2), a black penis-shaped dildo in N.M.'s vagina (count 3), a pink vibrating dildo in N.M.'s vagina (count 4), and defendant's penis in N.M.'s hand (count 5). A grand jury indicted defendant on all five charges on February 8, 2024. On February 14, 2024, defendant waived reading of the indictment, pled not guilty, and requested a jury trial. The trial court issued its pretrial discovery order on the same date.

¶ 6      On February 26, 2024, the State moved for medical testing pursuant section 11-1.10(e)(1) of the Criminal Code (see 720 ILCS 5/11-1.10(e)(1) (West 2022)) and supplemental discovery in the form of defendant's DNA pursuant to Illinois Supreme Court Rule 413(a)(vii) (eff. July 1,

2

1982)). The latter motion alleged that evidence collected in the case included N.M.'s sexual assault kit, exemplars from N.M., exemplars from N.M.'s mother, and sex toys taken into evidence. The State alleged that the evidence was sent to the Illinois State Police Forensic Science Laboratory (ISP Lab) to perform a forensic comparison of DNA recovered from the sex toys with exemplars from N.M. and it needed defendant's DNA to complete the analysis.

¶ 7     A hearing on those motions was held on February 28, 2024. Defense counsel objected to the motion for defendant's DNA, arguing that the DNA testing would delay defendant's trial. No objection was raised on the motion for medical testing. Ultimately, the trial court granted both motions. On the same date, the State filed a motion for continuance pursuant to section 103-5(c) of the Code of Criminal Procedure of 1963 (Code). See 725 ILCS 5/103-5(c) (West 2022). In support, the State expressed a need to obtain defendant's DNA and the resulting reports that would be obtained from the ISP Lab. The motion indicated that N.M.'s sexual assault kit was delivered to the ISP Lab on January 6, 2024,[1] and the current backlog at the ISP Lab was approximately 11 months. At the hearing on that motion, defense counsel objected, noting that defendant had been in custody for 40 days, with 38 days attributed to speedy trial due to the initial pretrial release continuance. Counsel argued that defendant's DNA swabs could have been taken prior to February 28, 2024. The State argued that defendant requested a preliminary hearing which delayed the process by three weeks. It also noted that once the indictments were returned, the first pretrial date set was February 26, 2024, and this was the first opportunity for the State to present motions. The court stated that the motion filing was not "an inordinate delay" and found due diligence was shown. The court granted the motion for 120 days and noted defendant was "asserting speedy trial

---

[1]The January 6, 2024, date in the State's motion was erroneous because the sexual assault examination did not occur until January 18, 2024, and the search warrant was not executed until January 19, 2024.

as of today." On March 15, 2024, defendant sent correspondence to the parties stating that he objected to any continuations of his case and requesting his presence at every hearing.

¶ 8    On April 1, 2024, the State moved for a second continuance pursuant to section 103-5(c). The motion indicated that the State had not received the results from the lab for the materials taken following the February 28, 2024, hearing. The motion further noted that defendant had been in custody for 75 days as of April 2, 2024. A hearing on the motion was held on April 2, 2024. Defense counsel objected to the motion, contending that the State dragged its feet on the initial motion for DNA and had not shown due diligence. The court reviewed the dates when steps were taken by the State, found the State had exercised due diligence, and granted the motion over defendant's objection.

¶ 9    On May 7, 2024, the State filed a third motion to continue, stating that in addition to the five counts involving N.M., it would be filing five additional counts against defendant related to a second child, N.S., which also involved the sex toys. It stated that swabs from defendant and N.S. were collected on March 7, 2024, and taken to the ISP Lab, but the forensic DNA testing had not yet been completed. The State's motion requested an additional 120 days pursuant to section 103-5(c). 725 ILCS 5/103-5(c) (West 2022).

¶ 10    On May 8, 2024, five additional counts of predatory sexual assault (counts 6-10) were filed pursuant to section 11-1.40(a)(1) of the Criminal Code (see 720 ILCS 5/11-1.40(a)(1) (West 2022)) involving a different nine-year-old girl, N.S. The five charges alleged contact that included: defendant's penis in N.S.'s mouth (count 6), a black penis-shaped dildo in N.S.'s vagina (count 7), a pink vibrating dildo in N.S.'s vagina (count 8), defendant's penis and N.S.'s hand (count 9), and defendant's hand and N.S.'s vagina (count 10). Defendant was arraigned on the new charges, pled not guilty, requested a jury trial, and demanded speedy trial. After a brief meeting with defendant,

4

defense counsel stated that they wished to waive the preliminary hearing and "make it a speedy trial."

¶ 11    The court next addressed the State's motion for continuance. The State stressed that the DNA evidence was "critical to this case." It explained that one of the sex toys alleged in the charging documents was being tested for N.S.'s DNA and that it demonstrated due diligence. Defense counsel objected to the motion, contesting the State's due diligence. The basis was again the original 40-day waiting period. Defense counsel also argued that new charges were being filed 130 days after defendant was in custody. He complained that there had been no "hearings on the outcry statements[2] or propensity" and the case had been "going quite a while" while they were "demanding speedy trial the entire time." The State reminded the court of the original delay at the beginning because they were waiting for the grand jury's ruling. It further argued that any delay as to the outcry statements was irrelevant to the issues presented in the motion to continue for DNA. Following argument, the court found that the State exercised due diligence and granted the motion to continue for an additional 120 days. On May 13, 2024, the State filed a notice of eligibility for natural life sentencing.

¶ 12    On May 20, 2024, defendant filed a *pro se* motion for suppression of evidence, motion to dismiss, and motion for relief, based on items allegedly taken into evidence and allegedly inconsistent statements issued by the victims. On May 30, 2024, the State filed two motions *in limine* requesting pretrial rulings related to outcry testimony pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2022)) and prior bad acts pursuant to section 115-7.3 of the Code. *Id.* § 115-7.3.

---

[2]An outcry statement is a hearsay exception, used in limited situations, allowing testimony from the person to whom the child reported sexual assault or abuse. See 725 ILCS 5/115-10 (West 2022).

5

¶ 13    On June 4, 2024, the State moved for a continuance, noting the timeline of obtaining and submitting the evidence and further stating that the testing remained incomplete as of June 3, 2024. The court stated, "Based on the representations in the written motion to continue I will find the State has exercised due diligence and allow that motion, including the request for the additional 120-day extension."

¶ 14    A hearing on the State's motions *in limine* was held on July 16, 2024. Due to time limitations, the hearing was continued to August 9, 2024. On August 9, 2024, the State filed a motion for continuance. The motion stated that the DNA testing as to N.S. was completed June 30, 2024. However, additional testing as to the first victim, N.M., was ongoing. It further noted that the Chicago Child Advocacy Center (CAC) interviewer, Rosemary Najarro, was out on medical leave until September 16, 2024, and her testimony was necessary for the August 9, 2024, pretrial hearing. At the beginning of the scheduled August 9, 2024, hearing, the State advised the court of its motion to continue, stating that the CAC witness's unavailability was an independent basis of the motion to continue. Defense counsel argued that the original 120 days plus the additional 120 days would run on October 11, 2024, which was over two months away and that the State would have ample opportunity to secure the appearances of its witnesses without granting an additional 60 days. Defense counsel stated that he had no objection to any continuance except one that went beyond October 11, 2024, which was the ending date for the 240 days previously provided. The State agreed that its continuance request may be premature but wanted to put the matter on record, if there was a timeline issue later. The court granted the State's motion to continue the hearing for 60 days, held the State's request for 120 days in abeyance, and rescheduled the continued motion *in limine* hearing for September 9, 2024.

6

¶ 15    On August 12, 2024, defendant filed a *pro se* motion for judgment of acquittal and a motion to dismiss indictment charges. The motions were based on allegedly contradictory testimony from the victims. On September 9, 2024, the State filed another motion to continue. The motion contained a timeline regarding the evidence and further noted that the DNA testing revealed an unknown male's DNA on the sex toys. The State believed the DNA belonged to a younger male sibling of one of the victims and requested additional 120 days to allow the State laboratory to perform DNA testing to confirm the younger male's identity.

¶ 16    At the September 9, 2024, pretrial hearing, defense counsel stated he would not be adopting defendant's *pro se* motions for suppression, dismissal, and relief filed on May 20, 2024, and August 12, 2024. Thereafter, the court completed the hearing on the motions *in limine*. Testimony was provided by N.M.'s father, N.M.'s grandmother, and CAC investigator Rosemary Najarro. Following admission of evidence and argument, the court waited to issue a ruling until it reviewed the CAC interview videos. The court then addressed the State's motion to continue. Defense counsel objected to the motion. The State argued that the court previously granted the 60-day request for Ms. Najarro's testimony and that it was now requesting the additional 60 days for DNA testing related to the unknown male profile. The State argued that it would withdraw the motion if defense counsel stipulated to the identification of the unknown male, but the information would be necessary at trial. Relying on *People v. Lacy*, 2013 IL 113216, the State argued that the motion was permissible because it involved different evidence. Defense counsel objected, stating his client had adamantly stood by his speedy trial rights since the preliminary hearing and they were currently at 235 days. He argued that the little brother had been in the house the entire time and could have been tested before now and the sex toy at issue was not found during the search warrant but was provided by the mother later. He called the evidence speculative and requested a denial of

7

the State's motion. In response, the State argued that while they had access to the child throughout the proceedings, there was no information of an unknown male's DNA until the test results were recently returned. The State also argued that it was hoping the results would be available for an October trial but was ensuring it had time to obtain the evidence if it was not available. The court found that based on the timeline, due diligence was shown and granted the motion. The court also set the case for trial on October 21, 2024, "subject to further motions depending on the DNA."

¶ 17    On October 17, 2024, the court issued its rulings on the motions *in limine*, that granted, in part, and disallowed, in part, statements contained therein. The State indicated that it had not yet received the DNA results but expected them by the following day and requested the trial date be set for the second week of the trial docket. Defense counsel objected on the basis of speedy trial but noted that if they went to trial on the second Monday, it would still be within the speedy trial period but did not want that extra week to count against defendant. The court set the trial date for October 28, 2024.

¶ 18    On October 28, 2024, the State amended the language in the information to change the word "in" to "on or inside" in counts 1, 3, 4, 6, 7, 8 and 10. The "small pink vibrating dildo" language found in counts 4 and 8 was also amended to "pink sex toy." Defense counsel agreed that he was not surprised by the amendments but objected to the use of the words "on or inside" when they had been using the language "inside" for the last 10 months. The State stated it was not a material change given the statements made during the CAC interview and that it was allowed to amend the information even during the course of the trial to conform the pleadings to the proof. The court found the amendments were not material changes, would not cause defendant undue prejudice, and did not violate his due process rights.

8

¶ 19    On October 29, 2024, Jim Kerner, a detective with the Urbana Police Department, testified that he executed a search warrant on 309 Hyde Drive, Urbana, Illinois, on January 19, 2024, looking for sex toys and electronics. He identified photographs of the home and confirmed they found defendant's debit card in the adult bedroom. They found an Apple iPad on the bed and a black sex toy in the bottom dresser drawer. They did not find the small pink sex toy at the scene.

¶ 20    Mae Wallace testified that she had eight daughters and was N.M.'s grandmother. She stated that when N.M. came to live with Mae in Champaign, Illinois, N.M. would occasionally visit and spend the night with her mother, Jasmine, in Urbana, Illinois. Jasmine's boyfriend was defendant. In early January 2024, Mae received a telephone call from Jorjio, one of her other daughters, about a conversation Jorjio had with N.M. Thereafter, Mae picked up N.M. from school. N.M. was surprised and nervous to see Mae and Mae asked N.M. what was going on. N.M. teared up and started telling Mae about some incidents that happened at the house with defendant. The incidents included defendant displaying his private area to her and laughing while her mother was asleep. N.M. also told Mae that defendant "put her mouth on him," which was on his private part and something about mucus. Mae believed that the mucus was sperm based on the act going on at the time and that N.M. said defendant put it on her butt after defendant masturbated. Mae stated that N.M. also mentioned that defendant touched her with a pink object and a black object shaped like a penis. N.M. also told Mae that defendant also showed her pornography. After N.M. told Mae what happened, N.M. seemed embarrassed, did not want to talk about it, began to cry, and became withdrawn. Mae stated that they took N.M. to the hospital the following day.

¶ 21    N.M. testified that she was currently 10 years old. She stated that one of her friends was N.S., who was the same age but a little older. When she stayed at her mother's house, defendant would be at that house and N.S. would sometimes stay there with N.M. While N.M.'s mother gave

9

her little brother a bath, defendant came out of her mother's bedroom. She and N.S. were in front of the TV. Defendant was wearing a white robe, laughing, and bouncing around. He was not wearing anything under the robe. N.M. and N.S. then went into N.M.'s room and defendant returned with a deck of cards and wanted to show them a magic trick. After her mother finished the bath, she came into N.M.'s bedroom and told the girls to go to sleep.

¶ 22     N.M. testified that defendant remained in the room after N.M.'s mother left and asked N.M. and N.S. to both touch his private part. They did and defendant was laughing. N.M. testified that defendant then touched her butt with his private part. She stated that defendant also touched her private part with his mouth. She stated that defendant touched N.S. in all the same places that he touched her. She saw mucus come out of defendant's private part. He touched her butt and N.S.'s butt with the mucus and later wiped it off with a towel. She and N.S. also put their mouths on defendant's private part. N.M. testified that defendant had two plastic things with him, a vibrating pink thing and a black model of a boy's private part. She stated that defendant put the vibrating pink object on both her and N.S.'s private parts. N.M. stated that defendant also put the black penis sex toy on her and N.S.'s private parts. She could not remember if defendant touched her or N.S.'s private parts with his hand. N.M. stated that they also made a TikTok video, but she could not remember when that happened. She stated that defendant warned her that if she told anyone about what happened, he would beat her. N.M. was at her Aunt Jorjio's house a few days later and told her aunt about what happened with defendant. She later talked to her grandmother and also told her what happened with defendant. She was later taken to the hospital and interviewed at the CAC.

¶ 23     Jorjio testified that she had three children of her own and N.M. was her niece. She knew defendant as her sister, Jasmine's, ex-boyfriend. Around Dr. Martin Luther King's birthday, N.M. went to Jorjio's house to spend the night like she did every weekend. Jorjio was putting the children

10

to bed and saw N.M. spooning Jorjio's son. Neither of them had pants on and Jorjio thought it was inappropriate, so she separated them. She spoke with N.M. and asked if something was going on or if someone had done something to N.M. N.M. provided defendant's name and Jorjio asked what happened. N.M. told her that defendant touched her "down there" and pointed to her vagina. At this point, N.M. was crying hysterically. Jorjio stopped asking questions and said they would talk about it the next day because N.M. was so upset. The next morning N.M. was standing by Jorjio's bedroom door when Jorjio got up. They went downstairs and Jorjio taped the conversation so N.M. would not have to say it all again. Jorjio stated that she had a similar experience, but N.M. did not know that. Thereafter, the recording was played for the jury. Jorjio testified that she called Mae and told her some of N.M.'s allegations but did not go into much detail. She and Mae took N.M. to the hospital the following day.

¶ 24    Jasmine testified that she was N.M.'s mother, and that she dated defendant for approximately two years. She stated that defendant was 33 years old and he would occasionally spend the night at her house when the children were there. She stated that defendant bought her three sex toys for Christmas in 2023. She identified two of the toys through photographs. Jasmine testified that her relationship with defendant was "pretty much over" by January 2024. She did not know anything until the police showed up at her house to perform a search. She stated that after the officers left, she located the pink sex toy, called Detective Adam Marcotte, told him what she found, and he retrieved the object.

¶ 25    Mindy Watson, a nurse at Carle Foundation Hospital, testified that she was a sexual assault nurse examiner and examined N.M. in January 2024. N.M. came in with her grandmother Mae and Aunt Jorjio. A head-to-toe assessment was performed and no injuries were seen. She opined that in most cases there was no evidence of injury or trauma. She was aware that the allegations

11

included a large black dildo and noted that the alleged incident occurred 12 days earlier. She stated that an internal examination was not performed because N.M. was only nine years old, and inserting a speculum was not in the best interest of children that age and could cause harm. No DNA was collected during the examination because Illinois only allowed seven days to collect DNA for a forensic examination. The examination took place on January 18, 2024, and N.M.'s last contact with defendant was on January 6, 2024.

¶ 26    David Roesch, sergeant of investigations for the Urbana Police Department, testified that he was present when the search warrant was executed on 309 Hyde Drive, Urbana, Illinois, on January 19, 2024. He spoke with Jasmine in his police vehicle. She had no idea why the officers were at her home. He provided the search warrant to Jasmine and after she read the document she began crying. She asked if N.M. was the victim and Sgt. Roesch said she was. Thereafter, Jasmine became even more upset.

¶ 27    Mary Tewell, a forensic interviewer for the CAC of Champaign County, testified that she performed N.M.'s interview. N.M. was brought in by her grandmother and aunt. She did not talk to them; she only talked to N.M. She agreed that the interview was recorded and confirmed that the State's exhibit contained the interview. She stated that N.M.'s word choice and behavior was proper for someone her age. Mary stated that N.S. was also interviewed at the CAC. Her demeanor and word choice were also appropriate for her age. The interview was recorded and she confirmed that the State's exhibit was N.S.'s January 23, 2024, interview.

¶ 28    Rosemary Lopez, f/k/a Rosemary Najarro, testified that she was a CAC interviewer in Chicago, Illinois. Rosemary interviewed N.M. a second time on April 8, 2024, when she was brought in by her father after making new disclosures in therapy. Rosemary did not know what was said in therapy but knew it involved sexual abuse. She did not discuss the matter with N.M.'s

12

father. She confirmed the interview was videotaped and identified the State's exhibit containing N.M.'s second interview.

¶ 29    Adam Marcotte, a sergeant with the Urbana Police Department, testified that he was lead detective in defendant's investigation. He agreed that an iPad and a black penis-shaped sex toy were taken into evidence. He stated that he regretted not submitting the sex toy for forensic testing, saying it was an oversight. Sgt. Marcotte later spoke with Jasmine and obtained a pink sex toy that was not found as part of the search warrant. He confirmed the object taken into evidence on February 2, 2024. He only saw Jasmine and her infant son on that day. To his knowledge, he had never been in a room with either N.M. or N.S. and was unaware of any mechanism where he could transfer their DNA onto the pink sex toy. He confirmed that the pink sex toy was sent to the ISP Lab for testing.

¶ 30    Following Sgt. Marcotte's testimony a stipulation was read addressing the chain of custody, how the evidence was provided to the ISP Lab, and the processes and procedures used by the lab analysts. It further addressed the data recovered from the iPad addressing web searches, the content on the pages searched, and the TikTok video, and agreed the hard copy evidence provided in relation thereto was a true and correct copy of the data obtained.

¶ 31    The following day, N.S. testified that she was currently 10 years old and in the fifth grade. She stated that she and N.M. used to spend a lot of time together. N.S. would go to N.M.'s house and defendant was occasionally present when N.S. would visit. She stated that defendant came in wearing a robe while she and N.M. were watching videos. She knew he was not wearing anything under the robe because he opened the robe and she saw his private part. He was smiling when he did it and it made her feel uncomfortable. He told the girls to give him the tablet they were watching, and when he returned the tablet, he showed them two or three videos. She identified the

13

videos that defendant showed them. She stated that defendant went to the bathroom to check on Jasmine and came back and asked them if they had their shorts off. They did not, so defendant told them to take them off and stated that if they did not take them off, he would not take them to fun places or give them any candy. Eventually, she and N.M. took their shorts off. Defendant left and returned with two plastic things. One was dark brown and one was pink. The dark one looked like a boy's private part. She stated that defendant put the pink thing on both her and N.M.'s "cookie" which was where they went to the bathroom. He did the same thing with the black thing on both of them. She stated that he also put his private part in her mouth and put his mouth on her private part. He did the same thing to N.M. She stated that liquid came out of defendant's private part and he put the liquid on their butts. She stated that she and N.M. also put their hands on defendant's private part because he told them to do so. After Jasmine finished in the shower, defendant told them both to "put y'all stuff on." When Jasmine came out of the shower, she told the girls they needed to go to bed. Defendant also showed them a video with two women licking each other. Defendant told her that if she told anyone what happened that she would be taken away, so N.S. did not tell her mother what happened. Eventually, N.M. told her mother and her aunt because they started asking her questions.

¶ 32    N.S.'s mother, Shavon, testified that defendant was the father of her third child, who was currently two years old. She stated that Jasmine was defendant's prior girlfriend and she received a call from Jasmine in January 2024. Shavon was at work at the time. Jasmine told her that police were searching her house. Jasmine and Jorjio later drove to Shavon's work and told Shavon that defendant touched N.M., and they believed that Shavon's daughter, N.S., was also touched by defendant. Shavon left work and picked up N.S. from school and took her home. Shavon's sister Bernadette was at their house and N.S. told Bernadette what happened. Bernadette then had N.S.

14

repeat it to Shavon. N.S. told her mother that defendant touched her down there and that it happened the previous weekend. N.S. also told Shavon about the sex toys, which included a vibrating pink toy and a black toy that looked like defendant's penis. N.S. told Shavon that defendant touched her private area with both. Shavon told N.S. that she would never see defendant again and N.S. was relieved.

¶ 33    Dana Pitchford, a forensic scientist with the Illinois State Police crime lab in Springfield, Illinois, testified that she compared the known standards of the individuals involved and the DNA found on the pink vibrator. N.M. was a moderate contributor of the DNA on the vibrator. N.S. was major contributor of the DNA on the vibrator. She explained that this was more than just transfer DNA. Following Dana's testimony, the CAC videos were played for the jury and the State rested. Defendant moved for a directed verdict which was granted for count 10, which was defendant's hand to N.S.'s vagina.[3]

¶ 34    The following day, closing arguments were presented and the jury instructions were read. After deliberating for an hour and a half, the jury found defendant guilty on all charges. The jurors were not polled and were released.

¶ 35    On November 18, 2024, defendant filed numerous *pro se* motions including claims of ineffective assistance of counsel, insufficiency of the evidence, and speedy trial violations. A motion for new trial was filed on December 2, 2024, by defense counsel. Included in defense counsel's motion was a claim that the court erred by allowing the State's motion to continue on February 28, 2024, because defendant had already been in custody for 40 days and the delay in moving for supplemental discovery showed a lack of due diligence on the part of the State. It further alleged that the later motions to continue should not have been granted. It also claimed a

---

[3]The State later conceded that count 5 should also be dismissed.

lack of due diligence related to the September 9, 2024, motion and contended the State could have obtained the DNA from other household members prior to that time.

¶ 36    A *Krankel* hearing was held on December 4, 2024. One of defendant's claims of ineffectiveness contended that defense counsel failed to file a motion to dismiss for speedy trial violations after defendant requested him to do so. Defense counsel responded, stating:

> "Your Honor, I did look at the possibility of being able to file that. My analysis on what the Court had ruled on was that you had granted the State's continuances and given them an additional 120 days twice and that we did not have grounds, based on those rulings by the Court, for a motion to dismiss. I did demand speedy trial at every opportunity. And I did make it a part of my post-trial motion, which [I] filed earlier last week, and it is my contention that the Court erred in granting those State's motions *** over our demand for speedy trial."

Ultimately, the court found no neglect by defense counsel on the speedy trial issue, or any of the other issues, and declined to appoint new counsel following the *Krankel* inquiry.

¶ 37    Defendant's sentencing hearing was held on December 12, 2024. The trial court first addressed defense counsel's motion for a new trial, which raised a speedy trial issue. Testimony was provided by Officer Daugherty of the Urbana Police Department regarding his taking of evidence from the hospital. He stated that he did not know when he picked up the evidence that N.M.'s exemplar was not included in the evidence collected from the hospital. Dana Pitchford testified that the ISP Lab had an "extreme backlog" and they "work cases to meet court dates." She stated that even working overtime, they could not keep up with the backlog. Dana advised that the evidence in this case was first submitted on February 1, 2024, and was inventoried on February 20, 2024. She stated that protocol requires a vaginal swab in rape kits, but if rape was not alleged,

16

no vaginal swab would be taken. If the nurse was not aware of the actual claims, a standard swab might also not be taken. Dana confirmed that as of February 20, 2024, there was no exemplar swab for N.M. because none was taken at the hospital. Dana testified that she did not begin working on the evidence until June 2024, which was the usual delay at the ISP Lab. Once DNA was found on the sex toy, her office requested N.M.'s exemplar on June 25, 2024, and it was provided to the ISP Lab on July 11, 2024. Dana made an additional request for an exemplar on August 26, 2024, because the DNA from a relative was also found on the sex toy and she had no exemplar for that relative. On cross-examination, she clarified that the first evidence received was on February 1, 2024, from N.M.'s sexual assault kit. She received the sex toys on February 15, 2024, and defendant's DNA on March 7, 2024.

¶ 38    Defense counsel argued that it was inordinately long for the State to wait over 40 days before asking for defendant's DNA. It further argued that it should not have taken the State as long as it did to provide exemplars of the family's DNA to the lab. In response, the State argued that because of the lab delay in not even being able to start until June 2024, any delay in obtaining defendant's DNA was of no matter. The State also argued that obtaining defendant's DNA was delayed due to defendant's request for a preliminary hearing and it was not unreasonable for the State to wait until a probable cause finding before it demanded a swab from him. As to N.M.'s swab, the State relied on Dana's testimony that if the sex toy had no DNA, there was no need to obtain N.M.'s exemplar and it was not until all the exemplars provided had been reviewed that it was determined that the additional family exemplar was needed.

¶ 39    The court stated that the speedy trial claims were "a little bit of a troubling issue." It did the calculations, noting that the defendant was arrested on January 19, 2024, and remained in custody throughout his trial which commenced on October 28, 2024. The first 120-day period

17

expired on May 18, 2024. The second 120-day period expired on September 15, 2024, and the 60-day request for the witness took it out to November 14, 2024, which was after the trial. Ultimately, the trial court found that speedy trial was not an issue and denied the motion for a new trial. Thereafter, defendant was sentenced to natural life. Defendant filed an appeal listing sentencing as the sole issue. He also filed motions for a new trial and reconsideration of the sentence on December 18, 2024. All of the motions were denied on January 21, 2025. Defendant's notice of appeal was later amended pursuant to an Illinois Supreme Court supervisory order. See *Freeman v. Illinois Appellate Court, Fifth Dist*., No. 132769 (Ill. Feb. 6, 2026)

¶ 40                                   II. ANALYSIS

¶ 41    On appeal, defendant contends that his right to speedy trial was violated. In support, defendant argues that the trial court abused its discretion in granting the State's motions to continue and that his trial counsel was ineffective for failing to properly preserve the issue for appeal because he never filed a motion to dismiss the charges on the basis of speedy trial. Defendant also argues that the trial court erred in failing to appoint counsel for him following the *Krankel* inquiry because his allegations of ineffective assistance of counsel revealed possible neglect of the case based on the speedy trial violation.

¶ 42    In response, the State argues that defendant waived any claim of a statutory speedy trial violation because defense counsel failed to file a motion to dismiss for a speedy trial violation. It further contends that even if the issue was not waived, the trial court properly granted the requested continuances. Finally, the State argues that the court did not err in denying the appointment of counsel following the *Krankel* inquiry.

¶ 43                              A. Speedy Trial

¶ 44    "Both the United States Constitution and the Constitution of Illinois guarantee an accused the right to a speedy trial." *People v. Kaczmarek*, 207 Ill. 2d 288, 293-94 (2003) (citing U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8). "An accused also has a statutory right to a speedy trial pursuant to section 103-5 of the Code of Criminal Procedure of 1963 (speedy trial statute), which specifies the periods of time within which an accused must be brought to trial." *People v. Kliner*, 185 Ill. 2d 81, 113-14 (1998). "The constitutional and statutory provisions address similar concerns; however, the rights established by each of them are not necessarily coextensive." *Id*. at 114. Here, defendant asserts only a statutory violation of his right to a speedy trial.

¶ 45    "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2022). A case may be continued upon request by the State for not more than an additional 60 days if the State has exercised due diligence but was unsuccessful in obtaining evidence or an additional 120 days if the State has exercised due diligence but was unsuccessful in obtaining DNA testing results. *Id*. § 103-5(c).

¶ 46    Whether a trial court acted properly in granting the State's continuance request is reviewed for an abuse of discretion. *People v. Battles*, 311 Ill. App. 3d 991, 995 (2000). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We review *de novo* the ultimate issue of whether the State violated defendant's right to speedy trial. *Kaczmarek*, 207 Ill. 2d at 295 (citing *People v. Crane*, 195 Ill. 2d 42, 52 (2001)).

¶ 47    Section 103-5 of the Code provides the basis for a statutory speedy trial violation. 725 ILCS 5/103-5 (West 2022). Section 114-1(a)(1) of the Code requires a written motion to dismiss for speedy trial violation. *Id*. §114-1(a)(1). Section 114-1(b) of the Code requires the motion to dismiss to be filed "within a reasonable time after the defendant has been arraigned" and if not timely filed, the grounds "are waived." *Id*. § 114-1(b). "[I]t was long ago established that the right to discharge granted by the statute was waived if not asserted by the defendant prior to conviction." *People v. Pearson*, 88 Ill. 2d 210, 216 (1981) (citing *People v. Stahl*, 26 Ill. 2d 403, 405 (1962); *People v. Walker*, 13 Ill. 2d 232, 235 (1958); *People v. Morris*, 3 Ill. 2d 437, 441-42 (1954)). It is undisputed that defense counsel never filed a motion to dismiss for a speedy trial violation. Therefore, we agree that the claim for speedy trial was waived and instead consider whether defense counsel provided ineffective assistance by failing to file the motion to dismiss.

¶ 48    The issue of defense counsel's effectiveness in failing to file the motion to dismiss was raised in defendant's posttrial motion and addressed at the *Krankel* inquiry. When questioned by the trial court about the lack of filing, defense counsel stated:

> "Your Honor, I did look at the possibility of being able to file that. My analysis on what the Court had ruled on was that you granted the State's continuances and [gave] them an additional 120 days twice and that we did not have grounds, based on those rulings by the Court, for a motion to dismiss."

Based on this statement, we will address the State's requested continuances but only through the lens of the trial court's *Krankel* finding that defendant's claim had no potential merit. On review of a challenged extension, we " 'examine the entire record as it existed at the time the motion for a continuance is considered.' " *People v. Hughes*, 274 Ill. App. 3d 107, 111 (1995) (quoting *People v. Antrim*, 67 Ill. App. 3d 1, 3 (1978)).

20

¶ 49      In the case at bar, defendant was placed into custody on January 19, 2024. The State filed six continuances in this case. While all were granted, only three are relevant due to the overlapping nature of the requested continuances. The State's first requested continuance was filed on February 28, 2024, and requested 120 days pursuant to section 103-5(c) of the Code. See 725 ILCS 5/103-5(c) (West 2022). The motion was filed in conjunction with a motion to compel the taking of buccal swabs from defendant pursuant to Rule 413(a)(vii). See Ill. S. Ct. R. 413(a)(vii) (eff. July 1, 1982). Both the motion to continue and the motion for buccal swabs involved forensic review of the sex toys recovered from the search warrant on January 19, 2024, against defendant's exemplars and N.M.'s sexual assault kit.

¶ 50      The motions were heard on February 28, 2024. At this time, the speedy trial termination date was May 21, 2024. The court addressed the State's motion to obtain defendant's buccal swabs and the motion to continue together. Defense counsel objected stating, "We've already filed speedy trial in this case and set the matter for trial in March. While my client believes that any test on DNA would be exonerating for him he does not want to incur the delay in this case." The State argued that the DNA testing was "absolutely relevant to the case. We're talking about a nine-year-old victim." It addressed the allegations of the use of sex toys and vaginal penetration, and the sexual assault kit that was submitted into evidence. Defense counsel argued that defendant had been in custody for 40 days and the motion and DNA swabs could have been done earlier. The State reminded the court that although defendant was arrested in January, he requested a preliminary hearing which delayed the judicial process.

¶ 51      The court granted the State's motion for supplemental discovery to obtain defendant's DNA and also granted the motion to continue since we are "just now getting DNA testing ordered." The court did not find the 40 days to be "an inordinate delay," noting the items were recovered in

21

January and they were barely to the end of February. While it was longer than the court "might like to see" it was not going to find that it was not due diligence. Therefore, the court granted a request for 120 days for the DNA testing.

¶ 52    Illinois Supreme Court Rule 411 states that the discovery rules "become applicable following indictment or information *** and shall not be operative prior to or in the course of any preliminary hearing." Ill. S. Ct. R. 411 (eff. Dec. 9, 2011). As such, the Rule 411 language precluded the State from requesting defendant's DNA pursuant to Rule 413(a)(vii) until either a preliminary hearing was held or an indictment was issued by a grand jury.

¶ 53    The grand jury indictment was issued on February 8, 2024, the trial court issued its pretrial discovery order on February 14, 2024, and the State filed its motion to obtain defendant's DNA on February 26, 2024. The State also filed a motion for a continuance pursuant to section 103-5(c) of the Code to have defendant's DNA analyzed the same day. Both motions were heard on February 28, 2024. Therefore, the State's request was made within 16 days of the indictment and 12 days of the trial court's discovery order. Based on those facts, we cannot find that the State's due diligence is even questionable. As such, the trial court's initial granting of the continuance on February 28, 2024, was not erroneous and we note that adding the 82 days left running on the original speedy trial period with the 120-day continuance provided on February 28, 2024, set the speedy trial termination date on September 18, 2024.

¶ 54    We also consider the State's May 7, 2024, request for continuance. Therein, the State argued that it was in the process of determining whether the sex toy contained the DNA of a second victim. The State's motion alleged that N.M.'s sexual assault kit was taken to the ISP Lab on February 1, 2024. The sex toy was taken to the ISP Lab, along with DNA from the victim's mother on February 15, 2024. An order requiring defendant to provide his DNA was issued on February

22

28, 2024, and defendant's DNA was collected that day. The State further alleged that defendant's genetic swab, as well as that from the possible second victim, N.S., were taken to the ISP Lab on March 7, 2024. The State alleged that as of May 6, 2024, the forensic testing was not complete.

¶ 55    A hearing on the motion was held on May 8, 2024, which was also the same day that the five additional charges involving N.S. were filed against defendant. After defendant declined a preliminary hearing on the new charges, the court addressed the State's requested continuance. The State stressed that "the DNA evidence is critical to this case. *** [O]ne of the objects alleged in the charging documents is being tested for the DNA of the named victim. I can't think of evidence that's more probative than that." Defense counsel again returned to the fact that the State did not take defendant's DNA until after he had already been incarcerated for 40 days. The State reminded the court that delay was due to waiting for the indictment. The court found the State "exercised due diligence" and granted "the request for an additional 120 days." This put the speedy trial at September 3, 2024.

¶ 56    On appeal, defendant argues that the continuance should not have been granted on May 8, 2024. He argues that the "last items the State attested to sending to the State lab for testing were sent on March 7, 2024, a mere 8 days after it was given a 120-day extension for DNA analysis." He contends that nothing new was added from the original request. However, it is clear from the State's motion that a second victim's DNA was now at issue.

¶ 57    Interpretation of section 103-5(c) of the Code was previously provided by the Illinois Supreme Court. See *People v. Lacy*, 2013 IL 113216, ¶¶ 19-22. Therein, the court found that each piece of evidence could potentially trigger a different request for continuance. *Id*. ¶ 16. The court reviewed the section 103-5(c) language and stated, "it is clear that the 60-day time period is tied to the specific evidence for which the continuance is being sought." *Id*. Because the State was also

23

seeking evidence from a different witness it was entitled "to seek a separate continuance to obtain 'such evidence.' " *Id*. Here, instead of having two witnesses that were unavailable at different times, the State was dealing with DNA evidence from two separate victims. As such, under *Lacy*, a second continuance was allowed, if due diligence was shown, the evidence was material, and there were reasonable grounds to believe the evidence would be obtained at a later time. *Id*. ¶ 22.

¶ 58    Here, N.S.'s exemplar was sent to the ISP Lab in a timely manner, shortly after the first continuance was granted. Equally apparent is the relevance and materiality of evidence related to whether the second victim's DNA was found on the sex toys taken into evidence. The State's motion indicated that the "forensic analysis will be completed in the future." As noted above, no argument as to the State's current due diligence was raised at the hearing. The basis of the objection was the fact that defendant's DNA was not taken until he had already been incarcerated for 40 days. At no time did defendant contend that no continuance should be granted on the basis raised on appeal. As such, any argument related to the May 8, 2024, continuance was forfeited, and even if it was not forfeited, the motion and the arguments related thereto clearly reveal that additional testing was requested due to the possibility of there being a second victim. Accordingly, there is no basis to find the court erred in granting the second continuance which then set the speedy trial termination date as September 3, 2024.

¶ 59    The State filed another motion to continue on August 9, 2024. At that time, although the State received the results for N.S.'s exemplar, it had not yet received results related to N.M.'s exemplar. That motion also included a second part which related to the availability of a CAC interviewer, Rosemary Najarro, for a pretrial hearing because Rosemary was out on medical leave and unexpected to return to work until September 16, 2024.  At the hearing on the motion, defense counsel stated that he had no objection as long as the trial was held before October 11, 2024, which

was when the first two 120-day motions to continue expired. The State clarified that it expected the DNA results in the next two weeks but was concerned about witness unavailability. It further agreed that the motion may be premature. The August 8, 2024, witness hearing was continued and the court reserved ruling on the motion until September 9, 2024.

¶ 60 On September 9, 2024, the pretrial evidentiary witness hearing was held. Notably, Rosemary's testimony was provided at that hearing. As such, the State's basis for the previously requested extension was no longer valid. However, the State also filed another motion to continue on September 9, 2024. The motion provided the past dates of the collection and submission of evidence to the laboratory and further noted that N.M.'s DNA testing was completed on August 26, 2024, but her "DNA tests revealed an unknown male profile on one of the sex toys." The State's motion further stated, "Based on conversation with defense counsel, the State believes the identity of the contributor to this unknown male profile may be a material issue at trial" and that the State believed the profile was that of a younger male sibling of one of the victims. The State further added that an exemplar of the male sibling was provided to the laboratory for testing on August 29, 2024.

¶ 61 Arguments by the State at hearing were consistent with the motion. Defense counsel again argued speedy trial and stated defendant had been in custody since January 19, 2024, which was 235 days by his count. He argued that the DNA of the victim's sibling could have been tested earlier, defendant's DNA was not taken until he had been in custody for 40 days, and DNA from the alleged victim was not collected until June. He further noted that the sex toy at issue was not obtained in the original search warrant but was taken later after the mother found it.

¶ 62 In making its ruling, the court stated:

"I do believe the timeline as laid out does show the exercise of due diligence. The biggest gap in that timeline is from March 7th, when swabs were collected and submitted, until August 26th, which is not an unusual length of time for DNA testing to take place. And then on August 26th, the unknown male profile was *** determined—or it was determined there was an unknown male profile. Within three days, as I'm reading the motion and affidavit, a DNA sample from the younger brother was sent to the lab. *** So I do think due diligence has been shown. I will grant the motion to continue over the objection of defense counsel."

As noted above, the decision in *Lacy* clarifies that different evidence will allow for additional continuances. See *Lacy*, 2013 IL 113216, ¶ 16. Therefore, the only issues are whether the State acted with due diligence in securing the evidence, that the evidence was material, and there were reasonable grounds to believe the evidence would be obtained at a later time. *Id*. ¶ 22. Here, the State's motion reveals that the unknown male DNA was found on August 26, 2024, and an exemplar was provided to the lab three days later. There was no indication that the brother's DNA would be necessary prior to August 26, 2024. As such, we find no error with the trial court's finding of due diligence. Clearly, another male's DNA on the sex toy would be relevant at trial and there is no dispute that the State expected the results back from the lab in a timely manner. As such, we cannot find that the trial court erred in granting the continuance. We also note that the trial court's ruling put the speedy trial termination date on January 6, 2025, and that defendant's trial started on October 28, 2024.

¶ 63                    B. Ineffective Assistance of Counsel

¶ 64    With the underlying facts related to the State's requests for continuances in mind, we now consider whether defense counsel's failure to file a motion to dismiss his case for a speedy trial

violation has merit. We apply the two-pronged *Strickland* test (see *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) to determine whether defendant was denied effective assistance of counsel. *People v. Torres*, 2024 IL 129289, ¶ 26. The two-pronged test requires a defendant to show that (1) counsel's performance fell below an objective standard of reasonableness "and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Id.* ¶ 27 (citing *People v. Peterson*, 2017 IL 120331, ¶ 79). Failure to satisfy either prong "precludes a finding of ineffective assistance of counsel." *Id.*

¶ 65 "The failure of counsel to argue a speedy-trial violation cannot satisfy either prong of *Strickland* where there is no lawful basis for arguing a speedy-trial violation." *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). Likewise, the failure to file a motion to dismiss for a speedy trial violation will not meet either *Strickland* prong where there is no lawful basis for arguing a speedy trial violation. As shown above, no abuse of discretion can be seen in the trial court's orders granting the February 28, 2024, May 8, 2024, and September 9, 2024, motions to continue, as each motion involved the DNA of three different people, which was permitted pursuant to *Lacy*. Further, defendant's trial was held before the third period of continuance expired. As such, we find defense counsel's failure to file a motion to dismiss for a speedy trial violation was not evidence of either deficient performance or prejudice and deny defendant's claim of ineffective assistance of counsel.

¶ 66                                 C. The *Krankel* Inquiry

¶ 67 Defendant also argues that the trial court erred in failing to appoint independent counsel following the *Krankel* inquiry. While defendant raised numerous bases of ineffective assistance of counsel before the trial court during the *Krankel* inquiry, on appeal, defendant limits his claim of ineffectiveness to counsel's failure to file a motion to dismiss pursuant to the speedy trial issue.

27

¶ 68 "The issue of whether a trial court properly conducted a preliminary *Krankel* inquiry presents a legal question" that this court reviews *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33. However, when the *Krankel* inquiry was properly conducted, the standard of review is whether the trial court's actions in failing to appoint counsel were manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98. Manifest error occurs when error is clearly evident, plain, and indisputable. *People v. Hightower*, 258 Ill. App. 3d 517, 519 (1994). Defendant does not argue any impropriety with the *Krankel* inquiry hearing itself and limits his contentions to the court's failure to appoint counsel following the inquiry. As such, we review the court's decision for manifest error.

¶ 69 The purpose of a *Krankel* inquiry is "to address fully a defendant's *pro se* posttrial claims of ineffective assistance of counsel and thus potentially limit issues on appeal." *People v. Jolly*, 2014 IL 117142, ¶ 38 (citing *People v. Patrick*, 2011 IL 111666, ¶ 41). The court operates as a neutral trier of fact by initially evaluating the merits of the claims. *Id*. ¶ 39. In determining whether to appoint counsel, the court first examines "the factual basis of the defendant's claim." *Roddis*, 2020 IL 124352, ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id*. "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id*. The claims must be firmly founded and sufficient, meaning that if true, they would alter the resulting conviction. See *id.* ¶ 47.

¶ 70 Here, defendant argues that the court's finding of no neglect on behalf of counsel because counsel raised the issues and was pursuing that issue was manifestly erroneous. He argues that the steps referenced by the court were insufficient pursuant to section 114-1(a)(1) of the Code that requires a timely written motion that defendant's trial was not in compliance with section 103-5 of the Code. Defendant also notes that section 114-1(b) of the Code confirms that the issue is

waived if the requirements of section 114-1(a)(1) are not met. See 725 ILCS 5/114-1(a)(1), (b) (West 2022).

¶ 71    We agree the trial court's statement fails to consider the statutory requirements; however, given the above analysis related to the granted continuances and the lack of any speedy trial violation, we cannot find that the trial court's ultimate finding that defendant's claim had no merit was manifestly erroneous. As such, we affirm the trial court's order declining to appoint counsel following the *Krankel* inquiry.

¶ 72                                   III. CONCLUSION

¶ 73    For the above stated reasons, we affirm the trial court's judgment and sentence.


¶ 74    Affirmed.